648 F.2d 135
 LEHMAN, Marjorie, on behalf of her children, William Lehman,
Mark Lehman, Frank Lehman
v.
LYCOMING COUNTY CHILDREN'S SERVICES AGENCY, Marjorie Lehman
and her children on whose behalf this action was
filed, Appellants.
 No. 79-2466.
 United States Court of Appeals,
Third Circuit.
 Argued March 27, 1980 before ROSENN, GARTH and SLOVITER,
Circuit Judges.
Reargued In Banc Nov. 17, 1980.
Decided March 31, 1981.
As Amended April 6, 7 and 13, 1981.
 
 Martin Guggenheim (Argued), New York City, Warren R. Baldys, Jr., Baldys & Baldys, Williamsport, Pa., Thomas Harvey, American Civil Liberties Union of Pennsylvania, Philadelphia, Pa., for appellants.
 Charles F. Greevy, III, Argued, Greevy, Greevy & Greevy, Williamsport, Pa., for appellee.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 This case requires us to determine whether a petition for a writ of habeas corpus is available for a federal constitutional challenge to Pennsylvania's statutory scheme for involuntarily terminating a parent's rights in her children. We hold that habeas corpus is not appropriate for the constitutional challenge here, and thus we affirm the district court's dismissal of Ms. Lehman's petition.
 
 I.
 
 2
 The facts giving rise to the instant petition are detailed in full in In re William L., 477 Pa. 322, 383 A.2d 1228, cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978), the Pennsylvania Supreme Court decision which held that Ms. Lehman's parental rights were properly terminated under a constitutional act. We recount some of the relevant circumstances drawn from the factual recital of that case, not to evaluate the merits of Ms. Lehman's constitutional claims, but rather to determine whether these facts constitute an extraordinary case impinging with especial harshness on personal liberty the hallmark for determining whether the requirement for the habeas corpus has been satisfied.
 
 
 3
 In June, 1971, appellant Marjorie Lehman, then age 39, was living with her three sons who are the subject of this proceeding: Frank, then age 7, William, then age 5, and Mark, then age 1. At that time she was pregnant with her youngest daughter Tracie. Tracie has lived with her mother since her birth. Ms. Lehman's eldest child, Carol, has lived with Ms. Lehman's parents for many years, and Ms. Lehman does not seek her return. In June, 1971, when pregnant with Tracie, Ms. Lehman voluntarily surrendered custody of her three sons to the Lycoming County Children's Services Agency (the Agency). Ms. Lehman had come to the attention of the Agency sometime earlier as a result of the deplorable living conditions that obtained in her apartment. Ms. Lehman and the caseworker agreed that the home was unfit for children.
 
 
 4
 After Tracie's birth, the Agency helped Ms. Lehman find a new apartment. Ms. Lehman vacillated between seeking an apartment large enough to accommodate only herself and Tracie, and one large enough for the three boys as well. She ultimately selected one suitable only for Tracie and herself. The boys remained in foster care. In November, 1974, more than three years after she had surrendered custody of her sons, Ms. Lehman requested that the boys be returned to her. At the time, she was still in the apartment suitable only for Tracie and herself. The Agency, concluding that Ms. Lehman could not provide her sons with necessary support and supervision, declined to return them. The Agency then filed a petition in the Court of Common Pleas of Lycoming County under section 311(2) of the Pennsylvania Adoption Act of 1970,[1] seeking to terminate Ms. Lehman's parental rights in the three boys, so that they could be placed for adoption without Ms. Lehman's consent.
 
 
 5
 Most of the evidence at the hearing on this petition consisted of the testimony of nutrition aides and caseworkers from the Agency who had visited with Ms. Lehman. After Tracie's birth, nutrition aides began regular visits to Ms. Lehman's home to help her maintain the household and raise her infant daughter. Ms. Lehman came to rely heavily on these aides to perform even the simplest tasks of everyday life. She made little or no progress in learning to handle problems without assistance. A series of incidents illustrates the depth of Ms. Lehman's incapacity. On one occasion, Tracie was sent home from school because she had lice. The nutrition aide could not make Ms. Lehman understand the need to rid Tracie of the lice or how to perform the simple procedure to achieve this result. Ultimately, as Tracie became upset about missing school, the aide herself was forced to perform the treatments.
 
 
 6
 On several occasions, Ms. Lehman has had her heat and electricity terminated for her failure to pay the bills. Once, Ms. Lehman sought emergency financial assistance to pay bills for rent, gas, water and electricity that she believed were due. On inquiry, the aide discovered that Ms. Lehman had already paid all of these bills. There was also other evidence of Ms. Lehman's incapacity to conduct her financial affairs responsibly. She told the aides on several occasions of making payment for items, such as toys, that were never delivered. She also told them of turning over her social security checks, her sole source of income, to creditors who would cash the checks, deduct amounts allegedly owed, and return to Ms. Lehman the difference.
 
 
 7
 As a result of Ms. Lehman's incapacities and the long period almost a decade since her sons have lived with her, relations between Ms. Lehman and the boys have deteriorated. The boys visited their mother in her apartment twice a month during late 1975 and early 1976 under a court ordered visitation plan. Aides present during these visits described them as "free-for-alls" in which Ms. Lehman would chase, in succession, each of the children about the apartment seeking to establish control. The two older boys appeared to do no more than tolerate their mother. The youngest boy, who has lived with a foster family since his first birthday, spent these visits watching television. Each of the boys testified in chambers that he did not want to live with his mother. The oldest boy admitted that he would not obey his mother and that she could not control him.
 
 
 8
 Other evidence at the hearing focused on Ms. Lehman's intellectual and social skills. A psychologist who administered a series of tests reported that Ms. Lehman has a mental age of six years, ten months, and that her social skills and ability to function independently were those of a twelve year old. The psychologist opined that Ms. Lehman lacked the social and intellectual maturity necessary to raise children.
 
 
 9
 Based on this testimony, the Court of Common Pleas found the appellant irremediably "incapable of providing minimal care, control and supervision for the three children." In re William Lehman, Nos. 2986-88, slip op. at 4 (C.P. Lycoming Co., June 3, 1976). The court rejected Ms. Lehman's argument that section 311 of the Pennsylvania Adoption Act was unconstitutionally vague. Accordingly, the Common Pleas Court terminated Ms. Lehman's parental rights in her three sons, making them eligible for adoption. The Pennsylvania Supreme Court held that the adoption statute was neither unconstitutionally vague nor violative of substantive due process and then found that the lower court's termination of Ms. Lehman's parental rights was supported by competent evidence,[2] In re William L., 477 Pa. 322, 383 A.2d 1228, cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).
 
 
 10
 Ms. Lehman's petition for a writ of certiorari was denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978), and thereafter she filed a petition for a writ of habeas corpus "on behalf of" her three sons in the United States District Court for the Middle District of Pennsylvania.[3] The petition asserted that the Pennsylvania Adoption Act was unconstitutional as applied and/or on its face, and sought the return of the children. It also sought a declaration that Ms. Lehman was their legal parent, or, in the alternative, the release of the children from the Agency's custody unless within sixty days "a hearing is held in the appropriate state court and it is judicially determined to be in the best interests of The Children that temporary custody should remain with the (A)gency."
 
 
 11
 The district court dismissed the petition for lack of jurisdiction, Lehman v. Lycoming County Children's Services Agency, No. 79-65 (M.D.Pa. Sept. 4, 1979), relying substantially on the holding of the First Circuit in Sylvander v. New England Home for Little Wanderers, 584 F.2d 1103 (1st Cir. 1978).
 
 
 12
 On July 23, 1980 a divided panel of this court reversed the district court. It held that "federal habeas corpus jurisdiction may be invoked to challenge the constitutionality of a state statute by which the state has taken custody of children and has terminated without consent the rights of a natural parent to them." Lehman v. Lycoming County Children's Services Agency, No. 79-2466, slip op. at 24, (3d Cir. July 23, 1980), vacated and rehearing en banc granted (August 15, 1980). Thereafter rehearing before the court en banc was ordered.
 
 II.
 
 13
 A habeas corpus action differs from other constitutional challenges in one exceedingly important respect. All other litigational claims, constitutional and non-constitutional, are subject to the doctrine of res judicata. That principle precludes a litigant who has fully and freely pressed a claim or defense in one court from obtaining a second adjudication of that claim or defense.[4]
 
 
 14
 Society, and hence, the law has a critical interest in finality, which is the basis for the doctrine of res judicata. In normal litigation, our jurisprudence dictates that this degree of finality has been reached after consideration by a court of original jurisdiction and a court of review. Thus, the doctrine of res judicata bars a cause of action that had earlier been determined in court, even if that determination was substantively in error. Habeas corpus, because it embodies considerations of personal liberty, is the major exception to this doctrine.
 
 
 15
 The writ of habeas corpus recognizes however, that this interest in finality cannot transcend each and every other societal interest. It represents our society's judgment that avoiding wrongful incarceration and unlawful restrictions on liberty outweighs the otherwise compelling interest in finality of litigation. Because this interest in personal liberty is one of our most highly valued constitutional rights, those who are in "custody" pursuant to a judgment of a court are, in almost all cases,[5] permitted to raise their federal claims in federal court, even those claims had once before been adjudicated. As Justice Brennan wrote for the Supreme Court majority in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).
 
 
 16
 "conventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review."
 
 
 17
 Id. at 424, 83 S.Ct. at 841.
 
 
 18
 While the ability to avoid res judicata is an extraordinary characteristic of habeas when the relitigation takes place within the same judicial system that is, when a state court entertains the writ on behalf of a person in custody pursuant to the judgment of a court of that same state the writ assumes even more profound implications when its operation cuts across the federal and state judicial systems. In this latter context, the writ empowers a single federal district judge to overrule determinations of federal issues which have been adjudicated by the highest court of a state. Sumner v. Mata, -- U.S. --, 101 S.Ct. 764, 767, 66 L.Ed.2d 722 (1981). Thus, the assumption of habeas jurisdiction by a federal court on behalf of a party complaining of a judgment rendered against him by a state court, represents an unparalleled assertion of federal authority over the state judicial system. Such an intrusion upon state judicial authority deeply implicates the principles of comity and may impair the smooth workings of our federal system.
 
 
 19
 The awesome power of the writ to avoid res judicata, and its implications for our federalism, demand that its use be confined to its proper role: the preservation of individual liberty and the relief from unlawful custody. This principle has been expressed by the Supreme Court in Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973):
 
 
 20
 The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. Since habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.
 
 
 21
 Id. at 351, 93 S.Ct. at 1574. (emphasis added).
 
 
 22
 Other commentators have expressed similar sentiments:
 
 
 23
 The historic custody requirement, although rooted in the procedural nature of the writ, took on a substantive character as habeas corpus came to be seen as an extraordinary remedy for the extraordinary restraints of custodial situations. The modern jurisdictional requirement (of custody) reflects this conception. Federal supervision of state judicial processes by means of the writ departs from traditional notions of deference owed state administration of federal law; problems of federalism aside, ordinary concepts of finality in the judicial process are displaced by the continuing availability of habeas for review of restrictions imposed by the judgments of federal courts. Therefore the restraints which have been thought appropriate for review in habeas proceedings are those which impinge with especial harshness on personal liberty those severe enough to warrant relitigation.
 
 
 24
 Developments in the Law Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1073 (1970) (emphasis added). The need to confine habeas to its proper sphere has become even more important as the scope of constitutional errors within its reach has expanded dramatically. See id. at 1041.
 
 
 25
 In deciding whether habeas corpus lies to challenge a termination of parental rights, we must determine, then, whether such a case presents the same, strong claim for overriding the interest in finality as inheres in the plea of a prisoner that he has been incarcerated in violation of the Constitution of the United States. We think the answer is clear: it may not, and for much the same reasons as those expressed in Sylvander v. New England Home for Little Wanderers, 584 F.2d 1103 (1st Cir. 1978). The principal reason may be plainly stated: habeas lies to challenge unlawful custody, but unlawful custody is simply not the issue in a parental rights termination case. It is not the liberty interest of the children that is sought to be protected in such a case, but only the right of the particular parent to raise them.[6] Such an interest is unrelated to the core concern of the writ of habeas corpus.
 
 A.
 
 26
 The federal habeas corpus statute for state prisoners, 28 U.S.C. § 2254, establishes custody as the prime requisite for relief. The statute provides in relevant part:
 
 
 27
 (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
 
 
 28
 (Emphasis added).
 
 
 29
 While the Supreme Court has held that persons other than incarcerated prisoners may be in custody and hence has extended relief under the writ of habeas corpus to them, see Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), such cases present instances of actual restrictions on the petitioners' individual liberty, all stemming from state criminal conviction.
 
 
 30
 In Hensley v. Municipal Court, supra, the habeas petitioner had been released on his own recognizance after his state conviction and sentencing, but prior to the commencement of his incarceration. In holding that the petitioner was in custody, the first factor that the Court looked to was that he was "subject to restraints 'not shared by the public generally.' " Id. at 351,[7] 93 S.Ct. at 1574.
 
 
 31
 Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) presented the situation of a state prisoner who was unquestionably in custody at the time when the district court and court of appeals considered his petition for a writ of habeas corpus. His petition was denied by the court of appeals and he then sought a writ of certiorari. Just prior to the granting of his petition for certiorari by the Supreme Court, Carafas was discharged from his parole status because his sentence had expired. The Supreme Court held that Carafas's case was not moot, and that Carafas was in custody within the meaning of the habeas corpus statute. The Court, in so holding, stressed that Carafas was subject to "collateral consequences," id. at 237, 88 S.Ct. at 1559, and "is suffering, and will continue to suffer, serious disabilities " Id. at 239, 88 S.Ct. at 1560.
 
 
 32
 Jones v. Cunningham, supra, involved a petitioner who was on parole after serving part of a state prison term. The Court ruled that he was "in custody" because "the custody and control of the Parole Board involve significant restraints on petitioner's liberty which are in addition to those imposed by the State upon the public generally." Id. at 242, 88 S.Ct. at 1561.
 
 
 33
 Relating these principles to the Lehman family situation, it is immediately apparent that unlike Hensley, Carafas, and Jones, the three boys here suffer no restraints that can be equated to the restraints which permitted habeas corpus relief in those cases. If indeed a characteristic of habeas custody is that the restraint suffered is "not shared by the public generally," Hensley at 351, 93 S.Ct. at 1574, see also Jones at 242, 83 S.Ct. at 376, we fail to understand how the situation of the three Lehman boys differs from the situation of other children in "the public generally" who are subject to parental or foster parental care and living arrangements. Thus this record discloses no restraint on liberty in terms of Hensley and Jones and no "collateral consequences" in terms of Carafas. Nor are we aware of any other expressions of federal habeas corpus "custody" which would include a child custody situation such as the one presented by Ms. Lehman's petition.
 
 B.
 
 34
 Sylvander v. New England Home for Little Wanderers, supra, is the only case that has analyzed whether the termination of parental rights meant that the children were "in custody" for habeas corpus purposes.[8] The facts of Sylvander, are remarkably similar to those of this case. Gail Sylvander relinquished custody of her son, Michael, to the New England Home for Little Wanderers, a state licensed, albeit privately run institution.[9] After Mrs. Sylvander rescinded her permission granting the Home the right to put her son up for adoption, that institution petitioned the Massachusetts Probate Court for authority to dispense with the mother's consent to the child's adoption. That court found that it was in the best interests of the child to be placed with prospective adoptive parents. The Supreme Judicial Court of Massachusetts affirmed the order of the probate court and rejected Sylvander's argument that the statute's standards were unconstitutional.
 
 
 35
 Sylvander did not take an appeal to the United States Supreme Court, nor did she file a petition for certiorari. Instead she filed a petition for habeas corpus in the district court for the District of Massachusetts, joining with it a complaint pursuant to 42 U.S.C. § 1983. The district court dismissed her case, and the First Circuit affirmed.
 
 
 36
 After concluding that res judicata barred the § 1983 action, the First Circuit then held that there was no custody for habeas corpus purposes. It pointed out that the Supreme Court "had never acknowledged that habeas corpus is an appropriate remedy for litigating federal constitutional claims arising from child custody disputes." Id. at 1110-1111. The First Circuit wrote:
 
 
 37
 It is of course true that, although the wording of the federal habeas statute is tailored to fit state criminal proceedings, the habeas remedy has been made available in other contexts. What is not clear is that this case presents yet another situation to which that remedy should be extended. Here, the custody that the habeas petition seeks to challenge is a state's assignment of the responsibility for the upbringing of a child to one person or another, in that child's "best interests." Michael is not a detainee or one undergoing some form of state-imposed restraint or disability, but rather is living with persons who have taken interim parental responsibility for him at the request of a private institution after a judicial determination that he may be adopted without parental consent. This is not the kind of custody that has traditionally prompted federal courts to assert their jurisdiction in the face of prior state adjudication. It cannot meaningfully be said that the person in custody Michael is being held against his will. The "rights" Ms. Sylvander now asserts on Michael's behalf are chiefly her own her rights as a mother not to be deprived of her child. Only speculatively are they the rights of the person in "custody." Indeed, several years of state court litigation resulted in the determination that the Home, a charitable institution established to promote the welfare of children, is correct in arguing that Michael's best interests lie in his being adopted. Thus, if this court were to recognize the availability of federal habeas in child custody cases, the proper party to seek the Great Writ on Michael's behalf in this case might as well be the Home as Ms. Sylvander.
 
 Id. at 1111.9a
 The court concluded that:
 
 38
 the question is who should bring Michael up. We do not think that Michael's mother may avail herself of federal habeas corpus to litigate her right to do so.
 
 
 39
 Id. at 1113.
 
 
 40
 Similarly in this case, the Lehman boys are not "detainee(s)" nor are they "undergoing some form of restraint or disability." Id. at 1111. "It cannot meaningfully be said that the" Lehman boys are "being held against (their) will." Id. at 1111. Just as Ms. Sylvander essentially was asserting her own rights in her child, the rights Ms. Lehman asserts on behalf of her children are chiefly her own her rights as a parent not to be deprived of her children. The "custody" of a foster or adoptive parent over a child is simply not the type of custody that may be challenged through federal habeas.
 
 
 41
 Ms. Lehman attempts to distinguish the facts of the present case, involving the power of the state to extinguish the rights of a natural mother in her children, from the typical private custody dispute among parents. Yet such a distinction, in terms of the availability of habeas, cannot be sustained.[10] In both instances a litigant uses the state's judicial machinery to establish the litigant's right to raise the child and to invalidate some other party's right to do so. Thus, the status of the child is the same whether determined in a "typical dispute between parents" or in a state parental right termination proceeding. If there is "custody" within the meaning of the habeas statute in the one instance, there must necessarily be "custody" in the other, because neither situation can be distinguished from the other in terms of the "extraordinary restraints," 83 Harv.L.Rev. at 1073, that must be present to satisfy the custody requirement. In both instances, the child's status at the completion of the action is the product of a state judicial decree.[11]
 
 C.
 
 42
 We recognize that outside the context of federal habeas which is extended to persons in custody pursuant to the judgment of a state court, habeas has seen a considerably expanded usage. Ms. Lehman, for instance, refers to the discussion in Jones v. Cunningham, 371 U.S. 236, 239, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963), and notes that under the English common law, habeas could be employed in custody disputes between warring parents. See R. Sokol, Federal Habeas Corpus § 6.1, at 73 (2d ed. 1969). Many states employ habeas for the same purpose. See discussion in Sylvander, 584 F.2d at 1110. But such cases are plainly inapposite to the question presented here. The use of habeas within a single, unified judicial system, that is, when the writ is extended by a federal court to a person in custody pursuant to the judgment of a federal court, or by a state court to a state prisoner, or by an English court to an English prisoner, does not implicate any concerns of comity. When one judicial system decides to subordinate the interest in finality to some other interest, that is its own prerogative. When the federal courts recognize the federal interest in liberty as superior to the state interest in finality, we face a quite different problem, one which has the most profound implications for comity and federalism. As the First Circuit wrote in Sylvander :
 
 
 43
 Federal habeas when applied to persons under state control is a procedure of unique potency within federal-state framework, having far different and more far-reaching consequences than a state's utilization of habeas within its own system. State utilization of habeas to test the legal custody of a child is part of the fabric of its reserved jurisdiction over child custody matters. If a habeas remedy were not provided, some other procedure would be needed to effectuate the state's substantive interest in these relationships. It is purely a matter of procedural detail whether the remedy is called "habeas" or something else.
 
 
 44
 584 F.2d at 1111.
 
 
 45
 Thus, when we confine our review of the authorities only to those cases in which federal habeas has been extended to individuals in state custody, it is clear that none of the cases relied upon by Ms. Lehman for a broad reading of the term "custody" would find "custody" in the situation presented here, and thus would not authorize the use of the writ in the present case.
 
 D.
 
 46
 Nor do policy considerations favor the availability of federal habeas in cases of this type. The child custody context is one where the interest in finality is especially weighty. It is widely recognized that children require secure, stable, long term and continuous relationships with their parents or the persons filling the role of parent. There is little that can be as detrimental to a child's sound development as prolonged uncertainty over whom he is to regard as his parents. And yet prolonged uncertainty in family relations must be the inevitable outcome of allowing the relitigation in federal court through habeas, of federal constitutional issues that were once fully adjudicated in state court. As the First Circuit wrote in Sylvander, "(i)t is by no means clear that the welfare of children and families would be promoted by creating a right to litigate in two sets of courts instead of one, thus extending the potential duration of litigation in this area." 584 F.2d at 1112.
 
 
 47
 We must also recognize that the child (whose liberty interests we must presume to be implicated in order to find a basis for the extension of habeas, see note 6 supra ) is little more than a pawn in the battle that engulfs him. Unlike the prisoner, who can control and direct the collateral attacks on his confinement, the child cannot call a halt to custody litigation whenever he sees fit. See Sylvander, 584 F.2d at 1112. The parties fighting over the right to raise the child will continue fighting, as Ms. Lehman has demonstrated, until there is no other forum in which they may do so. Providing another arena for this contest, by extending the federal writ of habeas corpus to custody actions, is hardly likely to serve the best interests of the child. See note 2 supra.
 
 
 48
 Nothing we have discussed here, however, should be read as a suggestion that the great writ may never be available on behalf of a child. We have indicated earlier that this case does not involve incarceration or restrictions or restraints affecting the Lehman boys' liberty any of which conditions might well be sufficient for habeas to lie. "Were (the Lehman boys) incarcerated in a state home, or were there other issues making this truly a struggle for liberty by one imprisoned under the aegis of the state," id. at 1113 (emphasis added), the writ might well be available. We hold only that parental rights termination suits, and other similar determinations of child custody, do not without more, provide a predicate for the use of federal habeas corpus.
 
 III.
 
 49
 Ms. Lehman argues that she should be afforded habeas corpus review, otherwise a federal court will never hear the merits of her claim. Such an argument assumes that there is an inherent right to a litigant to have a federal court consider his federal claims. No such right exists. See Allen v. McCurry, -- U.S. --, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Moreover, Ms. Lehman had a choice of two routes to a federal determination on the merits of her constitutional challenge and rejected both.
 
 
 50
 The simplest and most direct route was Ms. Lehman's right to appeal to the United States Supreme Court from the adverse judgment of the Supreme Court of Pennsylvania. By this means, Ms. Lehman could have immediately, and as a matter of right, obtained a decision from our highest court. She chose not to file an appeal, but, rather, simply petitioned for a writ of certiorari. Under 28 U.S.C. § 1257(2) (1976), a party who presents a federal constitutional challenge to a state statute (here, the Pennsylvania Adoption Act), and loses in state court, has the right to appeal to the United States Supreme Court. The Court's appellate jurisdiction, of course, is nondiscretionary: the Court must determine cases falling within this jurisdiction on the merits, even though it need not give such cases plenary consideration. Hicks v. Miranda, 422 U.S. 332, 343-44, 95 S.Ct. 2281, 2288-2289, 45 L.Ed.2d 223 (1975). Thus, had Ms. Lehman invoked the Court's appellate jurisdiction, instead of petitioning for certiorari, she would have obtained a ruling on the merits of her constitutional challenge. By deciding to forego an appeal and instead petitioning for certiorari, Ms. Lehman sought to avoid the res judicata effect that would attach to a summary affirmance on appeal, but not to a denial of certiorari.
 
 
 51
 The second route to a federal resolution of the federal constitutional challenge is available by the litigant reserving the federal claims during the state court litigation, and then bringing a subsequent challenge to the state statutory scheme in federal court under 42 U.S.C. § 1983 (1976). Such an approach is possible due to the limited res judicata effect accorded state court judgments in subsequent suits under § 1983, under the rule in this Circuit of New Jersey Educational Ass'n v. Burke, 579 F.2d 764 (3d Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978).11a
 
 
 52
 Normally, res judicata bars the assertion of claims that were or could have been litigated in an earlier suit. In Burke, this court held that, in a later § 1983 suit, res judicata would apply only to federal claims that actually were litigated, rather than to those that could have been litigated, in the earlier state court suit. We said that "a state court judgment forecloses a § 1983 litigant from raising grievances in federal court only if such claims have been pressed before, and decided by, a state tribunal." 579 F.2d at 774. We so held in order to give effect to the interest in providing a federal forum for the resolution of federal claims. Thus, Burke offered another federal route to resolve Ms. Lehman's constitutional challenge to Pennsylvania's statutory scheme for the termination of parental rights. Ms. Lehman could simply have withheld her federal constitutional claims in the state court proceedings, and then brought those claims in federal court under § 1983.
 
 
 53
 Ms. Lehman, however, takes issue with the suggestion that § 1983 is an appropriate vehicle for a constitutional challenge in this custody setting. She objects, noting that such a procedure precludes state courts from addressing federal challenges to state statutes and procedures. She also points out that a § 1983 challenge would require duplicate litigation.
 
 
 54
 To Ms. Lehman's first objection, we note only that the interest in presenting federal constitutional challenges to state courts in advance of consideration in federal court is not an interest that applies in all types of cases; it is, rather, limited to constitutional challenges to custody within the meaning of habeas. A routine § 1983 action, such as a constitutional attack on a state Medicaid program, or a state statute providing for pre- or post-judgment garnishment, of course need not first be presented to the state courts. As long as custody within the meaning of habeas is not implicated, as it is not in this case, the exhaustion requirement has no place. The Supreme Court itself has entertained constitutional challenges to state custody procedures under § 1983, without any indication that the failure to give the state courts an opportunity to consider the federal constitutional questions was a bar to federal jurisdiction. See Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).
 
 
 55
 To Ms. Lehman's second objection, that a § 1983 challenge requires duplicate litigation, we observe that we have only urged that if a federal forum is desired, § 1983 is an appropriate means of gaining entry. We have by no means suggested that litigants in Ms. Lehman's position ought to withhold their constitutional claims from the state courts and bring them in federal court later under § 1983. We believe that the state court is the appropriate forum for resolution of all aspects of these disputes, including the federal constitutional claims, although a litigant is not obligated to prosecute such constitutional claims in state court. Burke, as we have stated, gives a litigant such as Ms. Lehman a choice of fora for the determination of the federal challenge: she can raise federal constitutional issues in the state court, in which case she will be barred by res judicata from raising them in federal court, or she can reserve them in the state proceeding, and assert them in federal court under § 1983.[12] This scheme does not, however, give the litigant a right to have the claim determined both in state and federal court a right that is available under habeas corpus, but unwarranted in this context.
 
 IV.
 
 56
 We hold that custody disputes of the nature addressed here and which essentially involve no more than the question of who shall raise a child to maturity, do not implicate the federal interest in personal liberty sufficiently to warrant the extension of federal habeas corpus. Accordingly the order of the district court which dismissed Ms. Lehman's petition for a writ of habeas corpus will be affirmed. Each party will bear its own costs.
 
 
 57
 ALDISERT, JAMES HUNTER, III and WEIS, Circuit Judges, join in this opinion in all respects and also join in the concurring opinion of ADAMS, Circuit Judge.
 
 
 58
 ADAMS, Circuit Judge, concurring, with whom ALDISERT, JAMES HUNTER, III and WEIS, Circuit Judges, join.
 
 
 59
 The family relationship, whose origin is entirely independent of the state and whose rights are older than the Constitution itself, has been an unending source of sensitive legal problems. The present appeal compounds the delicate nature of the parent-child relationship with the intricacies of federal-state comity. Specifically before us is the question whether a federal court has jurisdiction to entertain an action based solely on the habeas corpus statutes, 28 U.S.C. §§ 2241 and 2254, brought on behalf of children by a parent claiming that the children are unconstitutionally confined. The application seeks the return of the children although the children have expressed a wish not to return[1] on the ground that parental rights were terminated pursuant to a state statute which allegedly violated the federal Constitution.
 
 I.
 
 60
 No federal court has squarely held that it has jurisdiction over an action bottomed uniquely on habeas corpus in this type case.[2] Nonetheless, it is admittedly arguable that the Lehman children technically fall within the literal language of the habeas statute. That is, in the words of the statute, they are conceivably "in custody pursuant to the judgment of a State court in violation of the Constitution," and "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(a) and (b). However, attempts to ascertain the meaning of custody for purposes of the Great Writ from the bare statutory language have, in the past, proven of little avail. As conceived by the Supreme Court, the writ "is not now and never has been a static, narrow, formalistic remedy." Jones v. Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963). Yet our understanding of the writ is infused with its historic applications: "To determine whether habeas corpus could be used to test the legality of a given restraint on liberty, (the Supreme) Court has generally looked to common law usages and the history of habeas corpus both in England and in this country." Jones v. Cunningham, 371 U.S. at 238, 83 S.Ct. at 374. But common law uses provide insufficient guidance in the present circumstances, first, because no federal system with its unique comity concerns existed at common law and second, because state child neglect and parental termination proceedings are predominantly tools of the modern state.[3]
 
 
 61
 It is true that certain early English common law cases considered habeas "a proper mode" to be utilized by parents to regain custody of children. But such an arrangement establishes no more than that one avenue of relief available at English common law was called habeas, whereas today such an approach has substantially been supplanted by statutory proceedings.[4] Moreover, a reliance on the common law proves too much for Mrs. Lehman's purposes. Indeed, Mrs. Lehman herself concedes that federal habeas jurisdiction should be limited, and suggests that courts erect a distinction between domestic relations disputes[5] and child custody or termination proceedings involving constitutional questions. Mrs. Lehman insists that unlike the private dispute in the ordinary domestic relations controversy which awards custody to a successful parent or relative, thus leaving the child within the family unit, in the present case it is the state which has permanently upset a family, leaving some of the children state wards. The English common law precedents,[6] however, involve precisely the intrafamily or private party disputes which Mrs. Lehman acknowledges should not fall within federal habeas jurisdiction.
 
 
 62
 In America, the history of the jurisdiction of the federal courts to issue the writ of habeas corpus to persons alleging a custody in violation of federal law is one of carefully controlled statutory expansion. Originally, section 14[7] of the Judiciary Act of 1789 defined the substantive scope of the federal habeas power.[8] Initially, only challenges to the jurisdictional competency of federal courts[9] or to executive detentions without proper legal process[10] were cognizable on habeas. Most significant for the present situation was the proviso precluding federal court scrutiny of state imprisonments. The statute declared "that writs of habeas corpus shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." 1 Stat. 81-82 (1789).[11] While this limitation on federal habeas power was often merely implicit in the early cases, in Ex parte Dorr the Supreme Court made explicit that federal courts unqualifiedly lacked the power to issue a habeas corpus writ to any person in custody under a sentence or execution, whether civil or criminal, of a state court. 44 U.S. (3 How.) 103, 105, 11 L.Ed. 514 (1845).[12]
 
 
 63
 Our understanding of federal habeas jurisdiction is further informed by Chief Justice Marshall's explication in the landmark case of Ex parte Bollman, 8 U.S. (4 Cranch) 75, 2 L.Ed. 554 (1807),[13] of the character and scope of the writs federal courts were empowered to grant under section 14 of the 1789 Act. Chief Justice Marshall first noted that, unlike the common law, where the court's power to issue a habeas writ was an inherent one, in the American system, judicial authority to grant the writ flowed solely from the statutory grant. Secondly, Chief Justice Marshall distinguished the generic term habeas corpus, which included every species of the writ,[14] from the term habeas in its most important and constitutional sense, habeas corpus ad subjiciendum the writ used in cases of criminal confinement at common law and the form which Mrs. Lehman seeks to employ here.[15] "(W)hen used singly when we say the writ of habeas corpus, without addition, we most generally mean that great writ which is now applied for (ad subjiciendum); and in that sense it is used in the constitution." 8 U.S. (4 Cranch) at 95. Certain guideposts, then, emerge from the analysis set forth by Chief Justice Marshall. Federal habeas power in the sense of the Great Writ is confined insofar as Congress establishes the bounds of the courts' supervisory jurisdiction;[16] but the habeas corpus power is not a limited, auxiliary power, available only to aid the courts to exercise jurisdiction in cases which they are enabled to decide finally.[17] Rather, once statutorily conferred, habeas corpus is a distinct jurisdictional and remedial power to inquire into the cause of commitment. It embodies a court's traditional authority to test restraints on liberty.[18]
 
 
 64
 Although a series of legislative amendments dealing with the usages of the Great Writ followed the enactment of the Judiciary Act of 1789,[19] Congress in the course of passing such legislation in no way indicated a desire to embrace child custody concerns within the statutory scheme. The legislative history to the predecessor statute of 28 U.S.C. § 2254, the Judiciary Act of February 5, 1867, quite significantly fails to mention challenges to termination of parental rights as among the intended uses of habeas. Passed in the wake of the Civil War, when Congress was anticipating resistance to its Reconstruction measures, the 1867 Act was proposed "to enable the courts of the United States to enforce the freedom of the wives and children of soldiers of the United States and also to enforce the liberty of all persons under the operation of the constitutional amendment abolishing slavery."[20] At that time, Congress was preeminently concerned with providing a federal forum for the constitutional claims of state prisoners and with establishing the principle that military authorities have no jurisdiction over private citizens.[21]
 
 
 65
 Even today, the habeas statute speaks in terms of "the rights of the prisoner,"[22] thus continuing to reflect the specific thrust of the Judiciary Act of 1867. Of course, the original congressional purpose underlying the 1867 Act is not dispositive of the question presently confronting the Court; construction of the statutory phrase of "in custody" has evolved over time to embrace persons on parole,[23] persons unconditionally released from prison after filing a habeas petition,[24] persons released on their own recognizance,[25] and persons on unattached, inactive army reserve duty.[26] Nevertheless, the stamp of the criminal sanction pervades the overwhelming majority of habeas petitions, thus indicating the judicial and social perception of the scope of the Great Writ.
 
 
 66
 Insofar as the use of habeas in a case such as the one at hand is not historically foreordained or legislatively mandated, it is appropriate to inquire whether existing proceedings circumscribing the termination of parental rights are constitutionally adequate, or whether children such as the Lehman children have an interest that merits the added safeguard afforded by the habeas writ.[27] No empirical data has been brought to our attention which would demonstrate that family unity is being seriously jeopardized as a result of state statutes or procedures which do not deal fairly and equitably with such matters. In this very case a review of the record in the state proceedings shows no cavalier disregard of parental rights on the part of the governmental agency or the state courts. All this is in sharp contrast with the situation that prevailed when the habeas statute was last given an expanded construction. At the time of Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), few states had post-conviction hearing act procedures; thus federal habeas proceedings were necessary to assure appropriate protection of prisoners who were incarcerated without due deference to constitutional rights. Moreover, unless the federal courts were prepared to make their facilities available to vindicate such complaints it was at least doubtful, given the status of the complainants, that the legislative bodies would adequately respond to the problem.[28]
 
 
 67
 Under the circumstances, then, it would appear to be both unwise and impolitic for the federal courts to uncover a whole new font of jurisdiction at this time. Inasmuch as the Constitution specifically provides that jurisdiction for the lower federal courts should be conferred by the Congress, it would seem that a more prudent approach would be to permit Congress to determine whether § 2254 should be amended so as to empower the federal courts to enter the domain of child custody cases.[29]
 
 II.
 
 68
 Even assuming the propriety of extending jurisdiction under the federal habeas statute to the Lehman children, our inquiry does not end. Rather, what deserves special scrutiny here is whether it is proper for a mother in the posture of Mrs. Lehman to bring a habeas action on behalf of[30] children in the present situation.[31]
 
 
 69
 Normally, the law entrusts parents with providing for the basic needs of a child,[32] and out of respect for the "integrity of the family unit"[33] is reluctant to intervene in the private family domain. As the Supreme Court declared in Prince v. Massachusetts, "(i)t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Concerns of social pluralism and social order underlie this legal deference to parental authority within the family. The state is foreclosed from imposing a single conception of the good life on its citizens, inasmuch as the institution of parental authority fragments decisionmaking concerning the goals of childrearing. At the same time parental authority functions to socialize children, encouraging conformity to cultural norms.[34]
 
 
 70
 It might thus not appear illogical that should the state break up this family unit, a parent would have standing to challenge the intrusion as an infringement of the parental interest, of the family's interests, and, on the children's behalf, of their interest in an intimate, ongoing association.[35] But it is important to recognize that parents and children do not have identical interests. Clearly, the parental interest in the companionship, care and custody of the children is a strong one and is reciprocated by the child's equally weighty interest in the nurture, love and instruction of the parents.[36] However, the children have independent, private interests not necessarily shared by the parents,[37] just as the parents have interests in the children that are not reflected by the children themselves.[38]
 
 
 71
 For example, in Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), which held that the state may not impose a blanket provision conditioning an unmarried minor's abortion decision on parental consent, the Supreme Court recognized the existence of a child's privacy interest which the parent could not purport to represent. The Court noted that "(a)ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant." 428 U.S. at 75, 96 S.Ct. at 2834. Although an independent parental authority does exist which can be exercised for the sake of the parent rather than the child, the judiciary should be cautious in unquestioningly reinforcing such authority, especially in the context of terminations of parental rights.[39]
 
 
 72
 The existence of a "best interests of the child" standard, often used in domestic custody disputes,[40] is a further recognition that minors have interests and constitutional rights separate from those of the parents. Whether the judicial scheme permits independent legal counsel for the child, thus acknowledging the inability of the parents or the court to represent fully the interests of the child,[41] or retains the traditional model of the judge as parens patriae, protecting the child's interest, it attests to divergencies in the parents' and childrens' interest.[42]
 
 
 73
 Additionally, the state itself has a stake in the child's welfare. While the state's interest does not necessarily mirror the child's wishes, it similarly may not elide with the parent's conception of what is best for the child.[43] Thus, despite society's disinclination to subordinate parental prerogative to governmental authority, it has been recognized that the state can set limits on parental discretion when the physical or mental health of children is in jeopardy.[44] It is in this context, then, that it is necessary to determine whether Mrs. Lehman can be presumed to be speaking "on behalf of" the children so as to merit extending the use of habeas to persons whose parental rights have been terminated.
 
 
 74
 Although procedural protection can ordinarily be extended to one's liberty interest without diminishing the substantive liberty of another, the present situation illustrates that this is not universally valid.[45] Once a parent's rights are terminated, a parent is no longer presumed to represent the interests of the child.[46] Even if we assume that the statute under which the termination occurred, and which survived attack in the state courts, is unconstitutional, it is highly possible that Mrs. Lehman, in challenging the statute ostensibly on behalf of the children, may actually be asserting an interest that derogates from the child's interest.[47] That is, the child's interest in a sound family environment that the state statute was intended to protect may not be properly represented by the parent's demand for family unity.
 
 
 75
 The divergent interests between parent and child become clear when we focus on what Mrs. Lehman's federal habeas claim addresses. She is not, in this proceeding, attempting to prove her fitness as a parent or even her right to permanent custody of the children. Rather, she is attacking the state standard under which she was adjudicated "incapacitated" a standard which, in light of traditional deference to family autonomy, we must assume was crafted to give leeway to parental authority while incorporating the community's conception of minimally acceptable family conduct and the child's interest in mental health and protection. In contesting the state statute which already embodies a balance between the needs of the parent and the child, Mrs. Lehman is potentially undercutting the child's right and interest in a minimum parent-child relationship.
 
 
 76
 It may be that Mrs. Lehman has standing to make this challenge to the statute as an infringement of her rights directly in state or federal courts, such as in a suit brought under § 1983. But what is questionable here is her right to resort to a habeas petition, which can be framed only on behalf of her children. Once Mrs. Lehman voluntarily relinquished custody of her children ten years ago, the presumption of family integrity was undermined. The long period of separation, and the development by the children of stable ties with a different set of persons in loco parentis, further underscores the potential discrepancies between the interests of Mrs. Lehman and her children.[48] If Mrs. Lehman were to succeed in her habeas attack, a new state termination statute undoubtedly would be enacted to avoid the defects which Mrs. Lehman claims the present law possesses. Yet, upon reinstitution of the termination proceedings, Mrs. Lehman might well lose custody of her children once again. Inescapably, then, Mrs. Lehman's interests and her children's are not, in the context of this case, the same.
 
 
 77
 While the intervention of the state via parental termination proceedings signals a potential nonalignment of the parent and child's interests, another element the interest in finality is likely to be valued quite differently by parent and child. The parent's prime interest is theoretically in restoring family unity; the redundancy of habeas corpus and the prolongation of litigation is a burden which the parent may consider worth enduring for the sake of reestablishing parental rights. For the child, however, a prompt end to litigation and the clear establishment of a permanent association with a parent figure would seem to be the important goal.[49] From this perspective, it would not appear that the writ of habeas is being exercised here on behalf of the children.[50] This is especially so in a termination situation, where the unqualified ending of the original relationship offers the child an opportunity for an uninterrupted association following adoption by a new parent figure. Moreover, the prospect of a parent bringing a habeas petition on a child's behalf years after the termination of parental rights, and years after the child has attained an established relationship with another parent figure, presents an even greater potential conflict between the parent and child's interests.[51]
 
 III.
 
 78
 Accordingly, since it appears that a federal court does not have jurisdiction over the habeas petition in this case, and because even if it did it does not appear that Mrs. Lehman has standing to assert such an action on behalf of the three children, I would affirm the judgment of the district court.
 
 
 79
 SEITZ, Chief Judge, concurring.
 
 
 80
 I find this to be a most difficult case. On the one hand, I believe that the habeas corpus statute relied on by Ms. Lehman can be read to encompass this constitutional challenge to the Lehman boys' custody. Ms. Lehman contends that her sons are "in custody pursuant to the judgment of a State court in violation of the Constitution " See 28 U.S.C. § 2254(a) (1976). There is no suggestion that Ms. Lehman has failed to exhaust available state remedies. See id. § 2254(b). Therefore, the literal statutory requirements for exercise of section 2254 federal habeas corpus jurisdiction can be said to be satisfied.
 
 
 81
 Nevertheless, I believe that it is inappropriate for a federal court to exercise its jurisdiction in this case, whether jurisdiction is said to be present by virtue of section 2254 or because Ms. Lehman presents a federal question for which habeas corpus is merely a remedy. Attempts to seek federal habeas corpus when challenging state child-custody determinations have not been made until recently. See Sylvander v. Home for Little Wanderers, 584 F.2d 1103 (1st Cir. 1978); cases cited in Judge Garth's op. at n.8. There has been, therefore, a prolonged period during which there has been an absence of relevant precedent. Additionally, exercise of jurisdiction in this case would represent a significant expansion of the availability of federal habeas corpus, because constitutional challenges to state decisions in intrafamily custody disputes which are far more prevalent than parental-rights termination cases come within the literal requirements for federal habeas corpus relief to the same extent that this case does. If there is to be such a major departure from traditional uses of federal habeas corpus to challenge state-court judgments, it is not unreasonable to await a congressional directive on the matter.
 
 
 82
 I therefore vote to affirm the judgment of the district court.
 
 
 83
 ROSENN, Circuit Judge, dissenting.*
 
 
 84
 A plurality of this court is of the opinion that this proceeding essentially involves "no more than the question of who shall raise a child to maturity" and holds that it does not sufficiently implicate the federal interest in personal liberty to warrant federal habeas corpus. Garth pl. op., supra at 146.[1] In essence, the plurality sees the case as one involving nothing more than the custody of some children. But the question of who shall raise a child to maturity is not the issue now before us. The merits of Ms. Lehman's capability to raise her children, a matter which absorbs about one-third of Judge Garth's opinion, are likewise irrelevant at this time. The narrow but important issue before us is whether the district court erroneously dismissed for lack of jurisdiction the habeas corpus petition's constitutional challenge to Pennsylvania's statute permitting the State to terminate permanently the rights of a parent in her children without her consent. Inasmuch as only that narrow question is before us and because I believe the district court had jurisdiction to entertain the petition, I respectfully dissent.[2]
 
 I.
 
 85
 When Marjorie Lehman placed her three sons with the Lycoming County Children's Services Agency (Agency) for temporary foster care, she and the Agency apparently intended that the custody would be only temporary and that the children would be returned after her expected childbirth confinement and after satisfactory housing had been obtained.[3] The Agency later became convinced that she was incapable of raising her three sons and resisted Ms. Lehman's efforts to obtain the return of her sons. It filed a petition in the Court of Common Pleas of Lycoming County under section 311(2) of the Pennsylvania Adoption Act of 1970, 1 P.S. § 311(2) (Supp.1980), seeking to terminate the mother's parental rights.
 
 
 86
 The court did not find the appellant neglectful or abusive but found that she was "incapable of providing minimal care, control and supervision for the three children" and that her incapacity could not be remedied. In re William Lehman, Nos. 2986-88 (C.P. Lycoming County, June 3, 1976). Accordingly, the court granted the petition and awarded temporary custody of the children to the Agency pending placement in a foster home. The court also rejected Ms. Lehman's contention that section 311 of the Pennsylvania Adoption Act is unconstitutionally vague. On appeal to the Pennsylvania Supreme Court, appellant again raised her constitutional challenge. The Pennsylvania Supreme Court, however, upheld the lower court and found the statute to be constitutional. In re William L., 477 Pa. 322, 383 A.2d 1228, cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). Following the rejection of her constitutional challenge by the Pennsylvania Supreme Court, Ms. Lehman filed a petition for certiorari with the United States Supreme Court. The petition was denied with three justices dissenting. 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).
 
 
 87
 Thereafter, appellant filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania on behalf of her three sons. The petition, alleging that the children are unlawfully detained and restrained of their liberty by the Lycoming County Children's Services Agency in violation of the fourteenth amendment, sought to have them released from the custody of the Agency and returned to their mother's custody. The district court, however, dismissed the petition for lack of jurisdiction, Lehman v. Lycoming County Children's Services Agency, Civ. No. 79-65 (M.D.Pa., Sept. 4, 1979), and sua sponte issued a certificate of probable cause.
 
 II.
 
 88
 As the plurality indicates, whether federal habeas corpus is available to assert federal constitutional claims challenging state custody of a child pursuant to state proceedings terminating parental rights has been addressed at length by only one other federal appellate court. In Sylvander v. New England Home for Little Wanderers, 584 F.2d 1103 (1st Cir. 1978), the First Circuit considered the availability of section 1983 and federal habeas corpus actions to review a state adjudication that the consent of a child's mother would not be required in contemplated adoption proceedings. The plurality relies principally on this case. In Sylvander, however, custody of the child had been relinquished to a private adoption agency shortly after birth. The agency in turn had placed the child in a foster home. Thereafter, the adoption agency petitioned the state court for authority to dispense with the mother's consent to the child's adoption. The court granted the requested authority over the mother's objections. The mother's federal constitutional challenge to the applicable state statute was subsequently rejected by the Massachusetts Supreme Judicial Court. Thereafter, she filed in federal court a complaint under 42 U.S.C. § 1983 and a habeas corpus petition under 28 U.S.C. §§ 2241 & 2254 challenging the state proceedings. The First Circuit affirmed the order of the district court dismissing both the section 1983 complaint and the habeas corpus petition.
 
 
 89
 The First Circuit's decision rested upon its perception that the state interests in family law matters outweigh the "collateral" federal interests in the adjudication of federal constitutional rights.[4] From Sylvander the plurality draws the following conclusions: (1) A permanent termination of parental rights in children does not present "the same, strong claim for overriding the interest in finality as inheres in the plea of a prisoner that he has been incarcerated in violation of the Constitution of the United States." Garth pl. op., supra at 140. (2) "(H)abeas lies to challenge unlawful custody, but unlawful custody is simply not the issue in a parental rights termination case. It is not the liberty interest of the children that is sought to be protected in such a case, but only the right by the particular parent to raise them." Id.
 
 
 90
 I can only assume that the plurality would reach the same conclusion in every case involving a child even if the parent and child had an overriding love and attachment for each other where because of some exigency the State had acquired custody of the child. For example, suppose the father of several children had been killed in an automobile accident, his wife severely injured, and the children placed in temporary custody with the State. The plurality would hold that under such circumstances the mother could not assert her federal constitutional rights or the federal constitutional rights of her children in a federal court to resist an effort to terminate permanently the parental relationship between the children and her. For the reasons set forth below I disagree with Sylvander and the conclusions that the plurality draws from it. Moreover, because Sylvander concerned custody of a private adoption agency and did not involve state action, I conclude that its relevance to the case at bar is limited.
 
 
 91
 As I have already suggested, the question whether there is federal habeas corpus jurisdiction should not depend on the federal court's agreement or disagreement with the state court's disposition of the merits of the case. Such an approach is unsupported by accepted principles of jurisprudence. Jurisdiction consists only of the abstract power of a court to try a case of the kind or character of the one under consideration. Disposition of the issue presented by this case depends upon the resolution of two underlying questions. The first is whether federal review of state custody proceedings terminating parental rights in a child is available under the terms of the federal habeas corpus statute, 28 U.S.C. §§ 2241 & 2254. The second is whether, on balance, the exercise of federal habeas corpus jurisdiction in such cases serves the concerns of federal-state comity as well as other relevant policy considerations. I now turn to the first concern, the availability of federal review under the terms of the federal habeas corpus statute.
 
 III.
 
 92
 At common law, the writ of habeas corpus originated as a method by which the superior courts of the common law and the chancellor could extend their jurisdiction at the expense of inferior or rival courts. Ultimately, it took form and survived as the writ of habeas corpus ad subjiciendum by which the legality of the detention of one in the custody of another could be tested judicially. McNally v. Hill, 293 U.S. 131, 136, 55 S.Ct. 24, 26, 79 L.Ed. 238 (1934). In its classic form the writ was directed to the disposition of the custody of a prisoner. Bacon, in his Abridgment, wrote that the writ "is the most usual remedy by which a man is restored to his liberty if he hath by law been deprived of it." Bacon's Abridgment at 425, quoted in McNally v. Hill, supra, 293 U.S. at 137 n.3, 55 S.Ct. at 26 n.3.
 
 
 93
 The importance of the writ is implicitly recognized by the terms of the Constitution. Article I, section 9, clause 2 provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Congress first extended to the federal courts the power to issue writs of habeas corpus in the Judiciary Act of September 24, 1789, ch. 20, § 14, 1 Stat. 73, 81-82. The custody requirement of that statute was found in its prescription that the writ be used "for the purpose of an inquiry into the cause of commitment." That commitment, however, could be either civil or criminal. Ex parte Randolph, 20 F.Cas. 242, 252-53, 257 (C.C.D.Va.1833) (No. 11,558) (Marshall, Circuit Justice and Barbour, District Judge). The original broad grant of jurisdiction was limited only by the following statutory language: "Provided, That writs of habeas corpus shall in no case extend to prisoners in gaol, unless they are in custody, under or by colour of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify."
 
 
 94
 Thus, in its original form in our nation's history, the Great Writ did not reach the pleas of prisoners in state jails, those who have become the archetypal petitioners of modern days. It was not until passage of the Judiciary Act of February 5, 1867, ch. 28, § 1, 14 Stat. 385-86, that the writ was first made generally available to state prisoners. The removal in 1867 of the exception to the broad jurisdictional grant of 1789 made the Great Writ available to anyone "restrained of his or her liberty in violation of the constitution." Thus, the Supreme Court has observed that "the writ of habeas corpus should be left sufficiently elastic so that a court may, in the exercise of its proper jurisdiction, deal effectively with any and all forms of illegal restraint." Price v. Johnston, 334 U.S. 266, 283, 68 S.Ct. 1049, 1059, 92 L.Ed. 1356 (1948).
 
 
 95
 In modern times, the Supreme Court has stated:
 
 
 96
 The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action. Its pre-eminent role is recognized by the admonition in the Constitution that: "The Privilege of the Writ of Habeas Corpus shall not be suspended " U.S.Const., Art. I, § 9, cl. 2. The scope and flexibility of the writ its capacity to reach all manner of illegal detention its ability to cut through barriers of form and procedural mazes have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.
 
 
 97
 Harris v. Nelson, 394 U.S. 286, 290-91, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969). The purpose of the writ is "to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints." Fay v. Noia, 372 U.S. 391, 401-02, 83 S.Ct. 822, 828-829, 9 L.Ed.2d 837 (1963).
 
 
 98
 The current federal habeas corpus statute provides:
 
 
 99
 (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
 
 
 100
 (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.
 
 
 101
 28 U.S.C. § 2254. See 28 U.S.C. § 2241. Thus, there are four basic requirements to the exercise of federal habeas corpus jurisdiction. The person in whose behalf the petition is brought must be alleged to be (1) "in custody," (2) in violation of the federal laws or Constitution, (3) "pursuant to the judgment of a State court," and (4) available state remedies must be exhausted.
 
 
 102
 First, I think it cannot be gainsaid that appellant's sons are "in custody" within the meaning of the statute. In recent years the concept of custody has been expanded to include not only actual physical confinement but also other severe forms of personal restraint. Of course, the Great Writ always could and still can reach behind prison walls. But recent Supreme Court decisions have made it clear that habeas corpus "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." Jones v. Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963). See, e. g., Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (release of petitioner on own recognizance constitutes custody within meaning of habeas corpus statute); Hammond v. Lenfest, 398 F.2d 705, 711 (2d Cir. 1968) (inactive naval reservist who had been called to active duty but not yet reported for service was "in custody" within meaning of federal habeas statute notwithstanding the absence of any criminal conviction). Thus, "it is no longer necessary for a person to be under actual physical restraint in order to obtain habeas relief." Westberry v. Keith, 434 F.2d 623, 624 (5th Cir. 1970) (per curiam). The Commonwealth's supervisory control over the children in the case before us is sufficient to meet the custody requirement of the federal habeas statute.[5]
 
 
 103
 Contrary to the plurality's reading of Sylvander, neither the district court nor the First Circuit held that the children were not "in custody" for purposes of section 2254. In fact, in relating the district court's conclusion on the matter the circuit court stated:
 
 
 104
 The district court found that Michael, although living with foster parents, remained under the supervision and control of the Home, "a private, non-profit agency engaged in child care," and that this was sufficient to constitute "custody" in the Home.
 
 
 105
 584 F.2d at 1109. The district court found itself without jurisdiction because, even though Michael was committed to the Home through operation of a state court decree, there was not sufficient state involvement, given the private nature of the Home, to distinguish Michael's case from that of a child who is placed in the custody of only one parent by operation of a state court judgment. Since it was clear that the court had no jurisdiction in the latter situation because of countervailing policy considerations rather than a failure to meet the statutory requirements it decided it had none to entertain Michael's petition. The First Circuit approved this reasoning.[6] 584 F.2d at 1112. In the instant case the State is directly involved, not only through its judicial action in the section 311 proceedings, but also by virtue of a county agency maintaining "custody," as used in the statute, of the boys.
 
 
 106
 Second, Ms. Lehman's petition alleges that the custody of her children is in violation of several provisions of the United States Constitution. The petition asserts that section 311(2) of the Pennsylvania Adoption Act of 1970, under the provisions of which her parental rights were terminated, is unconstitutionally vague both on its face and as applied to her. In addition, she alleges that termination of her parental rights violated the fourteenth amendment because the Commonwealth failed to utilize less drastic alternatives. Furthermore, she avers that the Commonwealth had no compelling interest in terminating her parental rights in the absence of a finding that she had failed to provide adequate child care or that she would expose her children to serious and substantial harm in the future.
 
 
 107
 Third, the Commonwealth's custody of the children is pursuant to the judgment of a state court, the Orphans Court Division of the Court of Common Pleas of Lycoming County, Pennsylvania. In re William Lehman, Nos. 2986-88 (C.P. Lycoming County, June 3, 1976). Finally, having presented her constitutional argument to the Pennsylvania Supreme Court, appellant has satisfied the exhaustion requirement of section 2254. Accordingly, I believe that the requirements of 28 U.S.C. § 2254 have been satisfied and that, absent important policy reasons to the contrary, federal habeas jurisdiction is available to this appellant.
 
 
 108
 As I read the plurality opinion, it concludes that the Lehman boys are not "in custody" as that term is used in section 2254 and that, even if they were, the State's interest in the finality of its judgments, when combined with the traditional federal policy of deferral in the area of family law, outweighs the federal interest in keeping individuals free from unconstitutional deprivation of their personal liberties. I find this striking of the balance to be historically and rationally unacceptable.
 
 
 109
 The argument is advanced that were we to allow the exercise of federal habeas jurisdiction in the case before us, we will have effectively allowed an end run around the preclusive effect given state court judgments under section 1983. The plurality appears to have succumbed to this argument. But the plurality itself points out that state court judgments are shielded from section 1983 attacks only if the federal constitutional claims upon which the civil rights action rests were actually litigated in the state courts. See Garth pl. op., supra at 138 n.4. The plurality also acknowledges that the policy of federal deferral in matters involving family law will not override the federal interest in redressing unconstitutional deprivations of personal liberties when alleged in a section 1983 complaint.[7] Similarly, if the allegations in the complaint are proved, no amount of state concern for finality of its judgments will prevent a federal court from restraining the execution of the state judgment. Thus, it is not the state court's disposition of questions of family law, an area in which state courts are regarded as having special expertise,[8] that is protected by this court's rejection of Ms. Lehman's habeas corpus petition; rather, it is the state court's rulings on her federal constitutional claims that the majority holds that we are powerless to review.
 
 
 110
 The plurality's conclusion that we should not, as a matter of federal-state comity, undertake to review the propriety of the Pennsylvania courts' rulings on substantive federal constitutional law rests merely on the bald assertion that this case does not impinge "with special harshness on liberty." Even if that were the jurisdictional standard which I do not concede, and the plurality fails to cite any case that so holds how can one plausibly declare that the removal of a child by the State from his natural family and the non-consensual termination for all time of the reciprocal relationships between mother and children impinges less on personal liberty than the call to active duty of an inactive reservist who had not yet reported for service, Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968), or that it constitutes less of an impingement on liberty than experienced by an accused released on his own recognizance, Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).
 
 
 111
 For the reasons stated below it appears to me that, on balance, the exercise of federal habeas corpus jurisdiction accommodates the competing interests of the federal government and of the state in the privacy of the family without sacrificing the important concerns of either.
 
 IV.
 
 112
 I now turn to the question which I mentioned earlier, whether on balance, the exercise of federal habeas corpus jurisdiction serves the concerns of federal-state comity and other relevant policy considerations. In Sylvander v. New England Home for Little Wanderers, supra, the court reasoned that competing policy considerations militate against the exercise of federal habeas jurisdiction. The factors identified in Sylvander as militating against the exercise of federal habeas jurisdiction were primarily two: (1) exercise of habeas jurisdiction would interfere with significant state interests in the regulation of the family and domestic matters while serving only a collateral federal interest, and (2) there is no need to exercise federal habeas jurisdiction because other existing avenues of relief afford sufficient protection for federal constitutional rights. I consider each of these in turn.
 
 
 113
 The state interest in family relationships is well established and recognized by the federal courts. As the Supreme Court stated in In re Burrus, 136 U.S. 586, 593-94, 10 S.Ct. 850, 852-853, 34 L.Ed. 500 (1890), "(t)he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." Thus, this court, for instance, has declined to exercise diversity jurisdiction in domestic relations suits. Solomon v. Solomon, 516 F.2d 1018 (3d Cir. 1975). See Armstrong v. Armstrong, 508 F.2d 348 (1st Cir. 1974). This case, however, bears no similarity to Solomon which arose out of a contract claim for child support payments and was brought during an ongoing state proceeding relating to visitation rights. Appellant's petition in this case alleges that the Commonwealth of Pennsylvania has deliberately deprived these children of a fundamental personal liberty interest in contravention of the fourteenth amendment to the United States Constitution. Just as the federal deferral policy is overridden when such allegations are presented in section 1983 complaints, it logically should give way before identical allegations in a habeas corpus petition.
 
 
 114
 It is undisputed that this case does not involve a dispute between parents over the custody of their children. These are the types of disputes alluded to by the plurality which normally involve a determination of "who shall raise (the) child" and with which parent the child will reside. I repeat, what is at issue here is the constitutionality of a state statute that empowers the State to terminate permanently parental rights in their children without their consent and the many sensitive implications that follow therefrom. I see a fundamental difference between an action in which family members are struggling over, in the words of the plurality, "who will raise the child to maturity" and an action in which the State, even with all its beneficent motivations, moves against an existing family unit for the purpose of legally dismembering it. The latter, because the State proceeds against an individual and effectively deprives that individual of fundamental personal liberties, is not too unlike a criminal prosecution. Cf. Moore v. Sims, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) ("the temporary removal of a child in a child abuse context is 'in aid of and closely related to criminal statutes.' ").
 
 
 115
 This is a proceeding in which the State itself has taken temporary custody of the children after utilizing its own judicial machinery to terminate, permanently and in all respects, the legal relationship of the children and their natural mother. Thus, this is not merely a dispute over which of the children's natural parents should raise them but whether the State may constitutionally forever foreclose the children from any relationship whatsoever with their natural parent. The important social and psychological consequences of this distinction cannot be overemphasized. The total extinction of a familial relationship between children and their biological parents is the most drastic measure that a state can impose, short of criminal sanctions, to protect disadvantaged or neglected children. The termination of the mother's rights in her children is, in effect, a declaration to the children that their mother is legally dead. Therefore, any suggestion that the exercise of jurisdiction in this case will lead to the exercise of jurisdiction in ordinary child custody disputes between natural parents is disingenuous and palpably unrealistic.
 
 
 116
 Significant federal interests are implicated here. The Constitution recognizes a right to be free from unnecessary state intrusion into family relationships. The freedom of personal choice in matters of family life is protected by the Due Process Clause of the fourteenth amendment. Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974).[9]
 
 
 117
 The United States Constitution recognizes a "private realm of family life which the state cannot enter." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). This right may be characterized as the integrity of the family, see Note, Constitutional Limitations on the Scope of State Child Neglect Statutes, 79 Colum.L.Rev. 719, 720 (1979), or of intimate association, see Karst, The Freedom of Intimate Association, 89 Yale L.J. 624 (1980), and flows from "the importance of the familial relationship, to the individuals involved and to the society, (which) stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children," Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977). This right encompasses not only the parents' right to nurture, educate, love, and manage their children but the children's right to remain with and be raised by their natural parents.[10] Mr. Justice Brennan characterizes it as a "constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right." Id. at 846, 97 S.Ct. at 2110.
 
 
 118
 The importance of familial relationships to minor children is particularly significant. An intimate relationship with a loving, caring adult is imperative for children. Most often this is provided by the natural parent and the law so presumes. The Supreme Court has observed that "historically (the law) has recognized that natural bonds of affection lead parents to act in the best interests of their children." Parham v. J. R., 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979). Removal of a child from its natural parents may result in serious psychological harm and thus may inflict greater damage than the intervention was intended to prevent. Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985, 994 (1975).
 
 
 119
 The Supreme Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected."[11] Quilloin v. Wolcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978). Responsibility for the "custody, care and nurture of the child reside(s) first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, supra, 321 U.S. at 166, 64 S.Ct. at 442.
 
 
 120
 The Supreme Court has expressed in a variety of contexts an individual's right to be free of unwarranted state intrusion into family relationships. Significantly, for the purposes of the case before us, it has acted to enforce the federal interests implicated in state child custody proceedings. In Quilloin v. Wolcott, supra, for instance, the Court considered the claim of an unwed father that, as a matter of due process and equal protection, he was entitled to an absolute veto over the adoption of his child. In Smith v. Organization of Foster Families for Equality & Reform, supra, the Court entertained an action under 42 U.S.C. § 1983 which alleged that the New York procedures governing the removal of foster children from foster homes violated the Due Process and Equal Protection Clauses of the Constitution. Although the Court upheld the challenged statute, it recognized the importance of the biological family relationship in the nurturing and development of children. 431 U.S. at 842-45, 97 S.Ct. at 2108-2110.
 
 
 121
 Furthermore, the Supreme Court has made clear that natural parents have federal constitutional rights upon which the states may not encroach.[12] In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held that an unwed father is constitutionally entitled to a hearing as to his parental fitness before his child is removed from his custody. Central to the Court's holding was its recognition of the importance of familial relationships, even those "unlegitimized by a marriage ceremony." 405 U.S. at 651, 92 S.Ct. at 1212.
 
 
 122
 The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come(s) to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements."
 
 
 123
 Id.
 
 
 124
 Other federal courts have followed the Supreme Court's lead and acted to enforce these important federal rights under the civil rights statutes. In Duchesne v. Sugarman, 566 F.2d 817 (2d Cir. 1977), for example, the Second Circuit considered a damage action under the civil rights statute by a mother, on behalf of herself and her two children, for the allegedly unconstitutional action of a city child welfare bureau in taking and retaining her two children without her consent and without a hearing or court order. The court reversed the judgment of the district court dismissing the action and held that the welfare bureau's retention of custody of the children without judicial ratification amounted to a deprivation of the mother's and children's liberty interest in family privacy without due process of law. The court stated:
 
 
 125
 Here we are concerned with the most essential and basic aspect of familial privacy the right of the family to remain together without the coercive interference of the awesome power of the state. This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the "companionship, care, custody and management of his or her children," Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), and of the children in not being dislocated from the "emotional attachments that derive from the intimacy of daily association" with the parent, Organization of Foster Families, supra, 431 U.S. at 844, (97 S.Ct. at 2110).
 
 566 F.2d at 825 (footnote omitted).[13]
 
 126
 In Alsager v. District Court, 545 F.2d 1137 (8th Cir. 1976), aff'g per curiam 406 F.Supp. 10 (S.D.Iowa 1975), the court considered, in an action under 42 U.S.C. § 1983, a case factually very similar to the case before us. There, the parental rights of a natural mother and father in and to five of their six children had been terminated in state court proceedings. Subsequently, the parents brought an action in federal court challenging the state statute under which their parental rights were terminated as unconstitutionally vague and violative of substantive due process. The Eighth Circuit found the parents' substantive due process objection meritorious and held that the state had failed to demonstrate "a compelling interest sufficient to justify permanent termination of the parent-child relationships." 545 F.2d at 1137.[14] In reaching its conclusion, the court relied on the district court's recognition of a significant and constitutionally protected liberty and privacy interest in the integrity of the family unit. See Smith v. Organization of Foster Families for Equality Reform, supra, 431 U.S. at 842-44, 97 S.Ct. at 2108-2109.[15]
 
 V.
 
 127
 The relevant inquiry then is not whether the exercise of federal jurisdiction is ever appropriate in cases involving family relationships. The overwhelming weight of applicable precedent clearly indicates that such jurisdiction is not only appropriate but necessary.[16] Rather, the question is whether countervailing considerations of federal-state comity render inappropriate the exercise of federal habeas corpus jurisdiction when the constitutionality of a state statute providing for permanent non-consensual termination of parental rights in their children is challenged. It bears iteration that intellectually that abstract question should be decided separate and apart from the merits of the case.
 
 
 128
 An historical accommodation has been developed between the state and federal courts respecting the administration of federal habeas corpus. Following the Civil War, federal habeas jurisdiction was expanded to what was believed to be the constitutional limit. See Ex parte McCardle, 73 U.S. (6 Wall.) 318, 325-26, 18 L.Ed. 816 (1867). This expansion of federal habeas jurisdiction was intended to facilitate dealing with anticipated resistance to reconstruction measures planned by the Congress. But soon after the enactment of the expansive provision in the Act of February 5, 1867, ch. 28, § 1, 14 Stat. 385-86, the Supreme Court was faced with the issue of accommodating conflicting state and federal interests in the area of criminal justice administration. Thus, in Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), the Court held that, although the federal courts had the power to discharge a state prisoner restrained in violation of the Constitution, ordinarily the federal court should stay its hand on habeas pending completion of the state court proceeding. The considerations underlying the Court's holding were set forth in a later case:
 
 
 129
 While the federal courts have the power and may discharge the accused in advance of his trial, if he is restrained of his liberty in violation of the Federal Constitution or laws the practice of exercising such power before the question has been raised or determined in the state is one which ought not to be encouraged. The party charged waives no defect of jurisdiction by submitting to a trial of his case upon the merits, and we think that comity demands that the state courts, under whose process he is held, and which are equally with the Federal courts charged with the duty of protecting the accused in the enjoyment of his constitutional rights, should be appealed to in the first instance. Should such rights be denied, his remedy in the Federal court will remain unimpaired.
 
 
 130
 Cook v. Hart, 146 U.S. 183, 194-95, 13 S.Ct. 40, 43-44, 36 L.Ed. 934 (1892). These concerns of federal-state comity are reflected in the exhaustion requirements of 28 U.S.C. § 2254.
 
 
 131
 The continuing role of federal habeas corpus jurisdiction in accommodating competing federal and state concerns was more recently expressed in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). There the Court considered whether section 2254, the federal habeas corpus statute, was an available federal remedy by which to obtain relief for the allegedly unconstitutional deprivation of good-conduct time credits of a prisoner. The Court held that the appropriate remedy was through petition for writ of habeas corpus. Underlying the Court's holding was its recognition that "(t)he rule of exhaustion in federal habeas corpus actions is rooted in considerations of federal-state comity." Id. at 491, 93 S.Ct. at 1837. Thus, the Court noted that the strong policy underlying the exhaustion requirement of section 2254(b) is "to avoid the unnecessary friction between the federal and state court systems that would result if a lower federal court upset a state court conviction without first giving the state court system an opportunity to correct its own constitutional errors." 411 U.S. at 490, 93 S.Ct. at 1836. I think similar considerations apply here in a case involving state custody of minor children.[17]
 
 
 132
 In the case at bar, appellant has, in conformance with federal policy, presented to and received from the state courts an adjudication of her federal constitutional claims. In particular, I take note of the well-reasoned and thoughtful opinion of Justice Roberts writing for the Pennsylvania Supreme Court. In Re William L., supra, 477 Pa. 322, 383 A.2d 1228. We are urged by the Agency that should we grant appellant a collateral federal forum for the presentation of her constitutional claims, we will be effectively undermining the Commonwealth's interest in the sanctity of its own judicial proceedings. Were this an action under 42 U.S.C. § 1983, I might well find this argument persuasive. We have held that when a plaintiff has obtained a full and fair adjudication of his constitutional claims in a prior state court proceeding he is precluded from a later action under section 1983. New Jersey Education Association v. Burke, 579 F.2d 764 (3d Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978). The same preclusive effect, however, is not given to prior state court proceedings by the federal habeas statute. Indeed, the statute itself requires exhaustion of available state remedies prior to availing oneself of the federal habeas forum.
 
 
 133
 Here, the Commonwealth has terminated the constitutionally protected relationship of appellant and her three sons and taken temporary custody of the children. Although I express no opinion as to whether that action was appropriate, I believe that federal habeas corpus is an available remedy in this case. My conclusion is based on the following reasons. First, federal habeas corpus rests upon the paramount importance of preventing unlawful restraint and represents a considered judgment by the Congress that federal jurisdiction should be exercised when the statutory requirements are met. In the case before us, the three sons of Ms. Lehman are in the custody of the Commonwealth of Pennsylvania under the authority of an allegedly unconstitutional statute and she has exhausted available state remedies. Hence, the requirements of the federal habeas statute are met and federal habeas jurisdiction must be exercised unless there are compelling reasons to the contrary. Second, although there is an important state interest in the regulation of domestic relations, the case before us is not the ordinary dispute between parents for the custody of a child but concerns the power of a state statutorily to extinguish for all time the reciprocal liberty interests of a natural mother and her children through a state custody proceeding. Under such extraordinary circumstances, there is an overriding federal interest in ensuring that state intervention in family relationships takes place within constitutional bounds. Finally, the exhaustion requirements of federal habeas corpus offer an appropriate accommodation of those competing state and federal interests by requiring that the federal claims be brought first in state court while preserving the opportunity for federal review. Federal review, of course, would be limited to the federal constitutional claims. The question of the custody of the children would still remain in the state courts for determination subject to appropriate federal constitutional guidelines.[18]
 
 
 134
 Therefore, I believe federal habeas corpus jurisdiction may be invoked to challenge the constitutionality of a state statute which empowers the state to take custody of children and permanently terminate without consent the reciprocal rights and liberty interests of parent and children.
 
 
 135
 Accordingly, I would reverse the order of the district court dismissing appellant's petition for want of jurisdiction and remand for further proceedings not inconsistent with this opinion.
 
 
 136
 A. LEON HIGGINBOTHAM, Jr. and SLOVITER, Circuit Judges, join in this dissent.
 
 GIBBONS, Circuit Judge, dissenting
 
 137
 Marjorie Lehman appeals from the dismissal of her complaint seeking a writ of habeas corpus to regain custody of her children from the Lycoming County Children's Service Agency. As the several plurality opinions and Judge Rosenn's dissenting opinion note, her federal complaint was filed after she unsuccessfully litigated her claim for the childrens' custody in the Pennsylvania courts, and unsuccessfully petitioned for certiorari. The federal constitutional challenges which she asserts against the statute under which her parental rights were terminated, resulting in the loss of the custody of her children, are significant, but were not considered by the district court because it dismissed for lack of subject matter jurisdiction. I conclude that the dismissal was error, and should be reversed. I disagree, however, with the analysis of the issues in any of the opinions which have been filed.
 
 
 138
 The source of the confusion in resolving this case is appellant's attempt to treat habeas corpus as a source of federal subject matter jurisdiction. Habeas corpus, however, is relevant only as a remedy in aid of the court's exercise of such jurisdiction. The debate over the appropriateness of habeas corpus as a source of jurisdiction has sparked a misguided standing discussion, and, more importantly, has obscured the real nature of Ms. Lehman's claim. Ms. Lehman is arguing, on her own behalf, that Pennsylvania's termination of her parental rights was invalid because the relevant statute is unconstitutionally vague. Custody, a statutory incident to the termination decision, is significant only in the event that Ms. Lehman prevails in her constitutional challenge. In that case, the state would no longer have custodial rights in the children, and their return could be obtained through the habeas corpus remedy. There is federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and the case should be remanded for determination of the res judicata effect of the state termination decision.I
 
 
 139
 Habeas Corpus Does Not Provide Jurisdiction But May Be
 
 Available As A Remedy
 
 140
 The starting point for consideration of the power of a federal court to issue a writ dealing with custody is section 14 of the Judiciary Act of 1789:
 
 
 141
 That all the before-mentioned Courts of the United States, (District, Circuit, and Supreme) shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions (elsewhere defined), and agreeable to the principles and usages of law. And that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment. Provided, That writs of habeas corpus shall in no case extend to prisoners in gaol, unless where they are in custody, under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify.
 
 
 142
 1 Stat. 81-82 (1789) (footnote omitted).
 
 
 143
 Section 14 is not a statute dealing with jurisdiction. The first sentence simply deals with the power of courts to issue various kinds of mesne process necessary to their respective jurisdiction; jurisdiction, however, is elsewhere defined. Habeas corpus is listed with another mesne process writ, scire facias, and with an omnibus clause including all such writs.
 
 
 144
 In the second sentence, the power of single judges or justices sitting as members of a circuit court, was limited with respect to prisoners in jail. Whereas the first sentence deals with the powers of the courts, the subsequent reference to "either of the justices as well as the judges of the district court" is quite specifically a reference to the powers of the individual members of the original circuit courts which were comprised of two Supreme Court Justices and one District Court Judge. Section 4, 1 Stat. 74-75. Those single members of a circuit court, acting individually and not as a court, were given only the more limited power of inquiring "into the cause of commitment," rather than the general mesne process powers conferred on the court by the first sentence. That the commitment referred to in the section dealing with a single judge's powers is commitment to "gaol" is made clear by the proviso immediately following the second sentence.
 
 
 145
 Since it was common in 1789 to use various forms of capias writs in civil litigation, it is possible that the power of a single judge or justice to "inquir(e) into the cause of commitment" was intended to apply to civil commitments as well as criminal. In any event, however, habeas corpus as court process was not confined to inquiries into the causes of commitment to "gaol." As court process, habeas corpus included all uses of any form of the writ necessary for the exercise of jurisdiction. The proviso, which excepts state prisoners from federal habeas corpus relief, refers only to prisoners in "gaol," and thus in no way limits the courts' power to issue writs for other than prisoners in "gaol."[1]
 
 
 146
 Thus the suggestion that "(i)n America, the history of federal courts' jurisdiction to issue the writ of habeas corpus is one of carefully controlled statutory expansion," concurring opinion, at 148, is wrong for several reasons. First, section 14 was not jurisdictional. Second, except for prisoners in jail, to which the proviso applied, the grant of statutory authority to courts as distinguished from single judges was as broad as the common law. Every one of the careful statutory expansions to which either opinion of the majority refers involved prisoners in jail who would otherwise have fallen under the interpretation of the proviso announced in Ex parte Dorr, 44 U.S. (3 How.) 103, 11 L.Ed. 514 (1845).[2]
 
 
 147
 The first sentence of section 14, with which we are concerned, is now codified in two places. 28 U.S.C. § 2241(a) provides:
 
 
 148
 Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.
 
 28 U.S.C. § 1651(a) provides:
 
 149
 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
 
 
 150
 There has been no time since 1789 that federal courts lacked the power to issue writs for obtaining custody, other than for state prisoners, if such writs were in aid of their exercise of existing subject matter jurisdiction. The plurality's attempts to have the state prisoners proviso swallow sections 1651(a) and 2241(a) simply do not fit the legislative history of the governing statutes. That the All Writs statute authorizes writs other than in those instances provided in 28 U.S.C. § 2241(c) concerning state prisoners is made plain by Price v. Johnston, 334 U.S. 266, 278, 68 S.Ct. 1049, 1056, 92 L.Ed. 1356 (1948), in which the Court held that habeas corpus is available to facilitate the exercise of appellate jurisdiction by requiring the production of a prisoner to argue an appeal, and by the Court's discussion of the question. Moreover, although Price v. Johnston, supra, actually involved a state prisoner,[3] it is settled that habeas corpus may be used in non-prisoner cases. It has been used to test the validity of the exclusion of an alien free to go anywhere else in the world. Brownell v. Tom We Shung, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 99 L.Ed. 868 (1953); United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950); United States v. Jung Ah Lung, 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888). It also has been used to test the validity of a military induction order, Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917 (1944), and to test the validity of a military decision that a reservist, claiming to be a conscientious objector, was not entitled to a discharge, Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968). None of these cases involved prisoners. None of them would have fallen under the proviso in section 14, and none now fall within its codification, with exceptions, in 28 U.S.C. § 2241(c). In each case there was a recognized basis for federal question jurisdiction, and in each case non-prisoners had their non-jail custody contention considered and resolved.
 
 
 151
 The habeas corpus question to be resolved, which has nothing to do with the prisoner subsection, 28 U.S.C. § 2241(c), or with any of the cases on which the plurality opinions rely, is whether at common law habeas corpus could be used to obtain custody of children from someone other than a jailkeeper.[4] The answer is clear. In Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), the Court reviewed at length the situations in which habeas corpus was resorted to in domestic custody situations.
 
 
 152
 For example, the King's Bench as early as 1722 held that habeas corpus was appropriate to question whether a woman alleged to be the applicant's wife was being constrained by her guardians to stay away from her husband against her will. 4 The test used was simply whether she was "at her liberty to go where she please(d)." 5 So also, habeas corpus was used in 1763 to require the production in court of an indentured 18-year-old girl who had been assigned by her master to another man "for bad purposes." 6 Although the report indicates no restraint on the girl other than the covenants of the indenture, the King's Bench ordered that she "be discharged from all restraint, and be at liberty to go where she will." 7 And more than a century ago an English court permitted a parent to use habeas corpus to obtain his children from the other parent, even though the children were "not under imprisonment, restraint, or duress of any kind." 8 These examples show clearly that English courts have not treated the Habeas Corpus Act of 1679, 31 Car. II, c.2 the forerunner of all habeas corpus acts as permitting relief only to those in jail or like physical confinement.
 
 
 
 371 U.S. at 238-39, 83 S.Ct. at 374-375. The pre 1789 cases to which the Supreme Court makes reference establish conclusively that if child custody, other than custody in a state jail, were an issue in a case within the subject matter of the federal courts, habeas corpus would lie.[5] Nor is the rule that habeas corpus is available in custody matters confined to Great Britain, for as Jones v. Cunningham further noted:Again, in the state courts, as in England, habeas corpus has been widely used by parents disputing over which is the fit and proper person to have custody of their child, 12 one of which we had before us only a few weeks ago. History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.
 
 
 
 153
 371 U.S. at 240, 83 S.Ct. at 375 (footnote omitted). To the state habeas corpus cases referred to by the Court in Jones v. Cunningham can be added cases in the state courts in this circuit. See, e. g., In re C.M.D., 256 A.2d 266 (Del.Super.1969); S on behalf of L. v. H.M. and E.M., 111 N.J.Super. 553, 270 A.2d 48 (1970); Commonwealth ex rel. Ebel v. King, 162 Pa.Super. 533, 58 A.2d 484 (1948). See also New York ex rel. Halvey v. Halvey, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947); May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). Despite the plurality's assertion to the contrary, it is clear that habeas corpus is a traditional common law remedy in cases involving parental rights to custody of children. Their concern that the availability of habeas corpus in child custody cases will grow out of hand and habeas corpus seen as applicable in custody disputes between "warring parents" is unwarranted in light of the fact that the writ is available only if the complaint states a claim within the subject matter jurisdiction of the district court.[6]
 
 II
 
 154
 Does A Federal Court Have Subject Matter Jurisdiction
 
 
 155
 Since from the eighteenth century habeas corpus has been a traditional remedy by which to regain custody of wives and children, and even servants, and any use of habeas corpus as mesne process has, except in state prisoner cases, always been available to federal courts otherwise having subject matter jurisdiction, the next question is whether the complaint states facts under which the plaintiff could prove a claim within that jurisdiction.[7] That question does not, as Judge Garth suggests, depend on whether "there is an inherent right to a litigant to have a federal court consider a federal claim." Plurality opinion, at 144. Rather, it depends on whether Ms. Lehman's substantive claim is predicated on federal law, and whether Congress has entered a jurisdictional statute. Here the claim is predicated on a violation of due process. Sections 1331 and 1343(a)(3) of Title 28 of the United States Code afford jurisdiction over such claims. As Judge Garth acknowledges, plurality opinion at 145, this claim is one which could have been brought in the federal court in the first instance.
 
 
 156
 One barrier to subject matter jurisdiction in the district court was the ill-considered statement of a divided panel in Solomon v. Solomon, 516 F.2d 1018 (3d Cir. 1975), that federal courts do not entertain cases involving domestic relations. That case is no bar here, since the court en banc can overrule a prior panel opinion. Obviously the plurality has done so by assuming that a section 1983 action would lie in a child custody dispute presenting a federal question. Thus there is no need to restate here the views I expressed in my Solomon dissent as to why that case was wrongly decided. See 516 F.2d at 1027-33.[8]
 
 
 157
 The presently controlling precedent for subject matter jurisdiction is, as Judge Garth acknowledges, New Jersey Education Ass'n v. Burke, 579 F.2d 764, 766-71 (3d Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978). Under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343 a federal forum is available.[9] The question is not, as the district court assumed, a matter of jurisdiction. Rather it is a matter of determining whether there is some objection, going to the merits of the claims, for rejecting it. Judge Adams suggests a lack of standing. Judge Garth suggests res judicata. Both are defenses going to the merits, not to subject matter jurisdiction.
 
 III
 Standing
 
 158
 As both Judge Garth and Judge Rosenn note, Judge Adams' standing contention is a matter going to the merits which were not considered by the district court. Unlike them, however, I believe it can properly be considered here. Certainly we can affirm a dismissal of a complaint on erroneous jurisdictional grounds for the different reason that it fails to state grounds upon which relief could be granted. Harold Friedman, Inc. v. Thorofare Markets, Inc., 587 F.2d 127, 140 (3d Cir. 1978); PAAC v. Rizzo, 502 F.2d 306, 308 (3d Cir. 1974), cert. denied, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975). Thus it is necessary to consider Judge Adams' rather startling and far reaching standing proposition.[10]
 
 
 159
 Judge Adams asserts that Ms. Lehman lacks standing to assert the present habeas claim for custody of her children. He reasons that whereas the state has an interest in the welfare of the child, Ms. Lehman, in attacking the method by which the state has asserted that interest "may actually be asserting an interest that derogates from the child's interest." Concurring opinion, at 154. It is because of this possibly divergent interest that she is said to lack standing to seek their custody. This argument again confuses the posture of this case and the relevance of Ms. Lehman's request for habeas relief.[11] Plaintiff is not suing primarily for custody but, rather, is challenging the state's termination of her parental rights. Custody would be awarded only as a matter of relief. Certainly Ms. Lehman has standing to be in federal court; Judge Adams, in footnote 31, admits as much. Whether she wins or not, however, is another matter. Judge Adams errs in attempting to decide Ms. Lehman's right to bring suit by imposing his views as to whether she should be accorded the relief she seeks.
 
 
 160
 In doing so, he attaches legal significance to the fact that years ago, in necessitous circumstances, Ms. Lehman temporarily relinquished custody. By the legerdemain of lack of standing Judge Adams decides that Ms. Lehman's conduct is legally significant, giving legal effect to it to bar her at the courthouse door. By couching this decision in terms of that slippery and indefinite term "standing," he relieves himself of the obligation to explain to his colleagues and the world why the circumstances of that surrender of temporary custody ought to warrant the denial of Ms. Lehman's right even to be heard to claim that her children would be better off with her nurturing.
 
 
 161
 Even if one were to accept the proposition that an issue in dispute should be decided sub silentio in the guise of a standing holding, there remains the ipsi dixit that Ms. Lehman cannot resort to habeas corpus to assert her rights. Why not? Certainly a natural parent has rights which the law recognizes. When a husband resorts to habeas corpus because his wife is being kept away from him, the court obviously will consider whether the wife prefers other company. But he, certainly, has standing to claim that he has lost her companionship and services. So, too, when masters brought habeas corpus actions to obtain the return of bonded servants they certainly were asserting their own interests.
 
 
 162
 Thus I am not persuaded that Judge Adams' standing argument justifies the dismissal of the complaint.
 
 IV
 Res Judicata
 
 163
 The only real issue presented by this appeal is whether the judgment of the Pennsylvania court requires dismissal of Ms. Lehman's complaint as a matter of law. As with the habeas corpus discussion, the starting point is a statute. In any court in the United States, state or federal, the judgment preclusion effect of an earlier state court judgment is governed not by some abstractions derived from general principles, but by 28 U.S.C. § 1738. Since 1790 that statute has provided in relevant part:
 
 
 164
 Such judicial proceedings shall have the same full faith and credit in every court within the United States as they have by law or usage in the courts of such State from which they are taken.
 
 
 165
 At most, then, a district court confronted with a claim of res judicata is bound by a state court judgment only to the extent that the rendering state would be bound. See, e. g., Ford v. Ford, 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240 (1962); Kovacs v. Brewer, 356 U.S. 604, 78 S.Ct. 963, 2 L.Ed.2d 1008 (1958); New York ex rel. Halvey v. Halvey, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947).[12] Thus, the first level of inquiry is the effect which Pennsylvania accords terminations of parental rights.
 
 
 166
 What scarce Pennsylvania case law there is suggests that termination proceedings, governed by 1 Pa.Cons.Stat. §§ 301 et seq. (Purdon Supp.1979), are modifiable and subject to reopening. In In re Adoption of R.H., 485 Pa. 157, 401 A.2d 341 (1979), the supreme court considered a collateral challenge to both a voluntary and an involuntary decree. Although ultimately affirming the decrees, the court recognized that the decrees might have been reversed had the natural mother met her burden of proving the invalidity of the challenged decrees. Id. at 344. Cf. In re Adoption of Baby Boy (Benjamin), 452 Pa. 149, 305 A.2d 360 (1973) (voluntary relinquishment of parental rights and duties can be collaterally attacked prior to adoption).
 
 
 167
 By statute, a termination decree necessarily includes a custody award.[13] Given that custody is a necessary incident of the termination decree, Pennsylvania law as to the finality of custody determinations is particularly instructive. Significantly, Pennsylvania permits reopening. In 1977 it enacted the Uniform Child Custody Jurisdiction Act, Pa.Stat.Ann. tit. 11, §§ 2301-2325 (Purdon Supp.1980-1981). An avowedly jurisdictional statute, the Act is predicated on the assumption that all custody decrees are modifiable. Its purpose is simply to formalize a type of jurisdictional etiquette so as to minimize interstate conflict over the modifications. The reporter for the Special Committee which drafted the Act has said that it was based on the assumption that although states need not recognize as binding a custody decision of another state, they are authorized to do so. Bodenheimer, The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws, 22 Vand.L.Rev. 1207, 1232 (1969). See May v. Anderson, 345 U.S. 528, 535, 73 S.Ct. 840, 844, 97 L.Ed. 1221 (1953) (Frankfurter, J., concurring). Since its adoption, Pennsylvania courts have recognized that custody decrees are not final. See, e. g., Commonwealth ex rel. Zaubi v. Zaubi, 492 Pa. 183, 423 A.2d 333 (1980) (physically or emotionally harmful conditions); In re Sagan, 261 Pa.Super. 384, 396 A.2d 450 (1978) (abandonment or physical abuse). There may be a different result concerning the finality of adoption decrees, see, e. g., In re Adoption of Baby Boy (Benjamin), 452 Pa. 149, 305 A.2d 360 (1973), but decrees of termination of parental rights, prior to any judgment of adoption have an effect akin to that of custody decrees. But cf. D.Y.F.S. v. D.T. and J.T., 171 N.J.Super. 520, 410 A.2d 79 (1979). In this case, there has been no judgment of adoption with respect to any of the children.
 
 
 168
 Because of the posture in which the case is before us a dismissal for lack of subject matter jurisdiction the district court gave no consideration to what the law of Pennsylvania is on reopening either termination or custody determinations. My independent exploration of it does not leave me confident to say what that law is in all circumstances.
 
 
 169
 But federal law, binding Pennsylvania, would, I submit, require reopening on the basis of the constitutional infirmity of a judgment having ongoing effects. The reference in section 1738 to the law of the rendering state is a reference not only to the state's statutes and case law, but to federal law, constitutional and otherwise, relevant to the issue. Such law is the law of every state. Thus in determining whether or not a given decree can be given ongoing effects or whether or not a plaintiff should be relieved from such effects, federal law is fully operative.[14] Section 1738 cannot be interpreted as requiring us to give ongoing effect to an unconstitutional judgment. Although the literal words of section 1738 direct state and federal courts to the law of the rendering state and no further, literalism has never been the rule of construction applied to that statute. It is federal statutory law, not state law, which requires that a state court judgment be given any effect in the courts of another sovereignty. If that federal statutory law were to be construed to require giving ongoing effect to state court judgments which violated federal constitutional standards, the federal statute would itself violate the fifth amendment.
 
 
 170
 The due process limitations upon a literal interpretation of section 1738 are, in the jurisdiction to adjudicate and adequacy of notice and opportunity to be heard senses, obvious. Thus even before the fourteenth amendment it was recognized that despite the literal language of section 1738 some judgments were not enforceable in other courts in the same manner as in the original forum. Boswell's Lessee v. Otis, 50 U.S. (9 How.) 336, 13 L.Ed. 164 (1850). The Court in that and similar cases discussed the problem in terms of jurisdiction to adjudicate. We know, though, that authority to adjudicate is a matter of due process. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Those cases applied the fourteenth amendment due process clause, but it is clear that if a judgment were to be rendered in violation of them an interpretation of section 1738 requiring that the resulting judgment be enforced in another court, state or federal, would violate fifth amendment due process.
 
 
 171
 These obvious constitutional limitations on literal application of the statute do not, however, exhaust the range of constitutional limits on federal statutory law. If, for example, a state court injunctive judgment, long since final, imposed upon a defendant what amounted to a prior restraint in violation of the first amendment, an effort to require that another court, state or federal, give that judgment ongoing effect by virtue of section 1738 also would run afoul of the substantive limitations of the first amendment. Requiring ongoing enforcement of an unconstitutional judgment would infringe on an important superior federal policy. An example of this principle in operation is Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Maynard was convicted in New Hampshire three times for the misdemeanor of defacing his New Hampshire license plate by oblitering the slogan "Live Free or Die." All three convictions became final. Despite section 1738, and without inquiring into the res judicata effect New Hampshire would give to its three prior judgments on the legal question whether the New Hampshire statute violated the first amendment, the Court affirmed the grant of a federal court injunction under 42 U.S.C. § 1983 on first amendment grounds. If the Court had construed section 1738 to require that the New Hampshire judgments be recognized despite the first amendment, section 1738 would give continuing effect to an invalid prior restraint.
 
 
 172
 Arguably Allen v. McCurry, -- U.S. --, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), casts doubt on the foregoing analysis, even when collateral estoppel has the necessary effect of giving ongoing effect to a judgment which violates a substantive provision of the constitution as a matter of law. However, I do not think that Justice Stewart's opinion which does not even refer to section 1738 should be read as anything but an emendation of Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). At most it may be read as preventing fact relitigation in fourteenth amendment cases when the original fact litigation has satisfied procedural due process standards. So read it is consistent with the analysis I have suggested, and unexceptional. The Court did not decide whether the nonconstitutional rules of collateral estoppel and res judicata could validly be applied to require giving ongoing effect to judgments which even on the facts as found, substantively violate the constitution.[15] Strong evidence that Wooley v. Maynard, supra, was not overruled by Allen v. McCurry, supra, is that McCurry neither mentioned nor sought to distinguish the earlier precedent.
 
 
 173
 A judgment terminating parental rights and awarding custody, like one imposing a prison sentence, or one imposing a prior restraint, has ongoing effects. It deprives both parent and child of an ongoing relationship. Thus even if at the first level of inquiry it appears that Pennsylvania considers such decrees final for purposes of res judicata, the decrees disfavoring Ms. Lehman cannot be given preclusive effect if her constitutional challenges are valid.[16]
 
 V
 Disposition
 
 174
 Ms. Lehman's challenge to the constitutionality of the Pennsylvania statutory scheme is substantial. In re William L., 477 Pa. 322, 359, 383 A.2d 1228, 1247 (1978) (Nix, J., concurring and dissenting). It was not addressed by the district court, and is not addressed by the plurality. I agree that on the abbreviated record before us it would be unwise for us to decide it. But since the district court plainly had subject matter jurisdiction, and since the res judicata effect of the Pennsylvania decree cannot be determined without consideration of that challenge, the order dismissing the complaint should be reversed, and the case remanded for further proceedings.
 
 
 
 [1]
 Section 311(2) of the Pennsylvania Adoption Act of 1970, 1 Pa.Cons.Stat.Ann. § 311(2) (Purdon Supp.1979), authorizes termination of parental rights on the ground that:
 The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent.
 
 
 [2]
 The Pennsylvania Adoption Act of 1970, under which Ms. Lehman's parental rights were terminated, see note 1, supra, reflects the judgment that "a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." In re William L., 477 Pa. 322, 345, 383 A.2d 1228, 1239, cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978)
 In affirming the judgment of the lower court terminating Ms. Lehman's parental rights in her three sons, the Pennsylvania Supreme Court held that this strict standard of parental incapacity had been satisfied. Id. at 341-52, 383 A.2d at 1237-43.
 In Pennsylvania, as in virtually all jurisdictions, the overriding concern in child custody proceedings is the best interests of the child. Commonwealth ex rel. Parikh v. Parikh, 449 Pa. 105, 107-08, 296 A.2d 625, 627 (1972); Commonwealth ex rel. Drum v. Drum, 263 Pa.Super. 248, 397 A.2d 1192, 1193 (1979).
 
 
 [3]
 A parent has standing to bring a habeas corpus action on behalf of her minor children. See, e. g., United States ex rel. Kirk v. Kirkpatrick, 330 F.Supp. 821 (E.D.Pa.1971); Hegwood v. Kindrick, 264 F.Supp. 720 (S.D.Tex.1967). The agency argued before the district court that because the state decree terminated Ms. Lehman's parental rights, she lacked standing to file the habeas petition. The district court rejected that contention and it is not raised on appeal
 
 
 [4]
 Normally res judicata bars the relitigation of claims that were raised or could have been raised at the first trial. We have accorded limited res judicata effect to state judgments in subsequent suits under § 1983, applying res judicata only to bar claims that actually were litigated. See New Jersey Educational Ass'n v. Burke, 579 F.2d 764 (3d Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239
 
 
 [5]
 Not every federal claim can be raised again. See Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), which involves search and seizure challenges under the Fourth Amendment
 
 
 [6]
 Indeed, a fair reading of Justice Roberts' thorough and thoughtful opinion for the Pennsylvania Supreme Court suggests that the Lehman boys might find a far greater restriction of their personal liberty in a judgment returning them to their mother's custody than in the actual judgment severing Ms. Lehman's parental rights, inasmuch as each of the boys expressed a clear preference for not living with his mother. In re William L., 477 Pa. 322, 343, 383 A.2d 1228, 1239, cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978)
 
 
 [7]
 It also emphasized that its custody holding would not lead to a vast expansion of habeas jurisdiction. Id. at 353, 93 S.Ct. at 1575
 
 
 [8]
 Other cases have assumed that habeas jurisdiction lies in this situation; Rouell v. Oesterle, 626 F.2d 437 (5th Cir. 1980); Davis v. Page, 442 F.Supp. 258 (S.D.Fla.1977), aff'd in part, remanded in part, 618 F.2d 374 (5th Cir. 1980), rehearing en banc ordered July 8, 1980; Smith v. Edmiston, 431 F.Supp. 941 (W.D.Tenn.1977); United States ex rel. Reed v. Tinder, No. 75-45 (S.D.W.Va.1975). Because of their conclusory nature, these cases are not helpful and of very little persuasive value
 
 
 [9]
 It is of little importance that Sylvander involved a state licensed private agency, whereas in this case the Lycoming County Children's Agency is a county institution. In neither case are there restraints present, let alone restraints which impinge with especial harshness on personal liberty, see 83 Harv.L.Rev. supra at 1073, the hallmark of custody in a habeas case
 9a On page 160 of his dissenting opinion, Judge Rosenn asserts that "neither the (Sylvander ) district court nor the First Circuit held that the children were not 'in custody' for the purposes of § 2254." It is true that the district court for the District of Massachusetts so reasoned. It is not true that the First Circuit affirmed that reasoning. Contrary to Judge Rosenn's impression of the court of appeals opinion, a fair reading of the passage quoted in text above from that opinion, indicates beyond question that the court of appeals in Sylvander held that "(t)his is not the kind of custody that has traditionally prompted federal courts to assert their jurisdiction in the face of prior state adjudication." 584 F.2d at 1111.
 
 
 [10]
 We recognize that there may be collateral differences between the termination of one parent's custody with the consequent award of the child to the other parent in a typical parental custodial dispute, and the termination of a parent's custody in a state termination proceeding. However, such differences that may exist are not significant in terms of habeas jurisdiction. Whatever effect they may have upon the parent-child relationship do not impact upon nor involve extraordinary restraints on liberty
 
 
 [11]
 If we were to permit the use of habeas for state termination proceedings, we would necessarily be obliged to permit the use of habeas for parental custody proceedings, thus opening the federal courts to a substantial number of matters which traditionally have been processed by state tribunals as matters of primary state concern
 11a Judge Rosenn's dissent in discussing the litigational strategy employed in a § 1983 action apparently takes issue with the holding of this court in New Jersey Educational Ass'n v. Burke, 579 F.2d 764 (3d Cir.) cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978). We point out that we have referred to Burke only in connection with a possible alternative available to Ms. Lehman for a determination of her federal claims. The § 1983 route, as we have noted in text, was rejected by Ms. Lehman. It appears to us that Judge Rosenn is questioning, not our analysis of Burke, but rather the underlying holding of Burke. However, no issue implicating Burke's holding has been presented to us on this appeal, and thus unless it is reconsidered and reversed by this court en banc, or rejected by the Supreme Court, Burke remains the law of this circuit. In this latter connection, we observe that the determination of this precise issue has been explicitly reserved by the Supreme Court in its recent opinion of Allen v. McCurry, -- U.S. --, -- n.5, n.10, 101 S.Ct. 411, 415 n.5, n.10, 66 L.Ed.2d 308 (1980).
 
 
 [12]
 Ms. Lehman in her brief suggests that § 1983 cannot provide a basis for the constitutional challenge raised here, and, indeed, that habeas is the exclusive route for such a suit, under the Supreme Court's decision in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In Preiser, the Court held that habeas corpus was the exclusive remedy for a prisoner who sought to challenge the fact or duration of his imprisonment and who seeks, by way of relief, a judgment that he is entitled to immediate or speedier release. The Court held that § 1983 was an improper basis for such a suit. Ms. Lehman contends that, since her constitutional challenge seeks by way of relief the release of her children from the custody of the agency, Preiser controls and compels the conclusion that habeas corpus and not § 1983 is the only proper basis
 This argument, once its initial premise is accepted, has a certain superficial appeal. But it is no more than another example of "how one goes in, determines how one comes out." Her argument proceeds: since this suit challenges "custody" within the meaning of habeas, habeas is not only an appropriate route for the challenge, it is the exclusive route under Preiser.
 We find the converse of her argument, however, to be far more convincing: this action does not challenge "custody" within the meaning of habeas, thus, habeas is an inappropriate basis for the suit, and § 1983 remains available.
 Certainly nothing in Preiser precludes our view. Preiser involved a challenge to incarceration brought by an inmate placed in prison as punishment for criminal conduct. The present context, a child custody suit, is for reasons we have discussed earlier, outside the rule of Preiser.
 
 
 [1]
 See In re William L., 477 Pa. 322, 383 A.2d 1228, 1239 (1978)
 
 
 [2]
 See plurality op. ante at 141 n.8 (noting small number of courts that have assumed without discussion, in somewhat different contexts, that habeas jurisdiction lies)
 
 
 [3]
 The past century has witnessed the attenuation of extended kinship and tight-knit community ties with the consequent vulnerability of nuclear and one-parent families. As informal social supports for troubled families have diminished, the role of formal social institutions has increased. See D. Rothman, The Discovery of the Asylum: Social Order and Disorder in the New Republic (1971). Cf. Ex parte Crouse, 4 Wharton 9 (Pa.1839) (Act of 1835 establishing House of Refuge for infants with incorrigible, vicious or morally depraved parents held constitutional). The habeas action brought by the father on behalf of the child in that case was denied. The 1835 Act was among the first of its kind
 
 
 [4]
 See B. Sharpe, The Law of Habeas Corpus 169 (1976). Such proceedings include, for example, actions for adoption, custody, or guardianship. See also Stanley v. Illinois, 405 U.S. 645, 647-49, 92 S.Ct. 1208, 1210-11, 31 L.Ed.2d 551 (1972)
 
 
 [5]
 Plaintiff admits that it makes sense that "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States." In re Burrus, 136 U.S. 586 at 593, 10 S.Ct. 850, at 852, 34 L.Ed. 500 (1890). Pl. Brief at 20. In light of this concession and the continuing vitality of the general proposition articulated in In re Burrus that traditionally questions concerning "the custody and guardianship by the parent of his child" do not arise under the Constitution, laws or treaties of the United States, see 136 U.S. 586 at 596, 10 S.Ct. 850, at 853, 34 L.Ed. 500 we are somewhat at a loss to understand the attack mounted against Solomon and Burrus by Judge Gibbons. See dissent infra at 173 n.8. Neither Burrus nor Solomon involved a federal claim or constitutional question. We fully agree that there are aspects of family life that are not immune from constitutional protection. Such issues are properly raised by stating a cause of action under 42 U.S.C. § 1983 or directly under the Constitution as suggested in Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); Parham v. J. R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); and Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). Mrs. Lehman is not presently asserting a claim in a § 1983 action or directly under the Constitution; rather, she has brought a complaint, bottomed solely on habeas corpus jurisdiction, seeking custody of her children
 
 
 [6]
 See Lyons v. Blenkin, 1 Jac. 245, 37 Eng.Rep. 842 (Ch.1821) (an English case holding that habeas is the proper mode for a father to regain custody of his child from an aunt); In re Matthews, 12 Ir.R.C.L. 233 (1859) (another English case in which the writ of habeas issued at the instance of a mother claiming the legal right to her infant who was then in the custody of a nurse)
 
 
 [7]
 Judge Gibbons contends that section 14 is not a jurisdictional statute. That section is, however, part of the first grant of federal court jurisdiction, Act of September 24, 1789. See Fay v. Noia, 372 U.S. 391, 400, 83 S.Ct. 822, 828, 9 L.Ed.2d 837 (1963). It is also the ancestor of 28 U.S.C. § 2241 which we understand to confer jurisdiction, as well as remedial powers, when the conditions defined in that section are found to exist. In Carbo v. United States, 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961), the Supreme Court noted that at least since 1842, the power of courts and judges to issue the Great Writ of habeas corpus had been subject to jurisdictional limitations, whereas the "all writs" power of courts, much like the judicial power in the English system, was without such limitations. 364 U.S. 611, 615-20, 81 S.Ct. 338, 340-43, 5 L.Ed.2d 329. However, we are not dealing here with an ad prosequendum or an ad testificandum writ, nor do we have jurisdiction premised on some other source, which this Court might then choose to enforce by means of a writ. We assume this is what Judge Gibbons' dissent is addressing insofar as he suggests that habeas may be a remedy. The complaint filed by Mrs. Lehman is grounded jurisdictionally solely on the habeas statute, 28 U.S.C. §§ 2241, 2254. It is not based on a 42 U.S.C. § 1983 claim alleging jurisdiction under 28 U.S.C. § 1343(a), nor has Mrs. Lehman presented this Court with any other basis such as diversity, for jurisdiction. Cf. Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509 (2d Cir. 1973) (diversity jurisdiction)
 
 
 [8]
 Section 14 provided:
 That all the before-mentioned courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs, not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And that either of the justices of the Supreme Court, as well as judges of the district courts, shall have power to grant writs of habeas corpus, for the purpose of an inquiry into the cause of commitment: provided, that writs of habeas corpus shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify.
 Act of September 24, 1789, ch. 20 § 14, 1 Stat. 73, 81-82 (1789).
 
 
 [9]
 See Ex parte Bollman, 8 U.S. (4 Cranch) 75, 100, 2 L.Ed. 554 (1807)
 
 
 [10]
 See Ex parte Randolph, 20 F.Cas. 242 (C.C.D.Va.1833). The dissent of Judge Rosenn argues that Ex parte Randolph supports the proposition that habeas will lie regardless whether the custody is civil or criminal. While the Randolph court suggested that habeas corpus might apply to a person imprisoned under civil process at the federal level, the court carefully noted that the case before it involved the abuse of process by an executive official, under a special jurisdiction, "which can neither be supervised by certiorari, or re-examined by writ of error." 20 F.Cas. 242, 253 (C.C.D.Va.1833)
 
 
 [11]
 As Chief Justice Marshall explained in Ex parte Bollman, a logical construction of the statute required that the proviso be read to apply to both the courts enumerated in the first sentence and the justices and judges in the second sentence. 8 U.S. (4 Cranch) 75, 98, 2 L.Ed. 554 (1807)
 
 
 [12]
 In Ex parte Dorr, 44 U.S. 103, 11 L.Ed. 514 (1845), Dorr sought to challenge his life imprisonment for levying war against Rhode Island on the ground that the state statute under which he was prosecuted was unconstitutional inasmuch as treason could not be committed against a state
 The conclusion in Ex parte Dorr tends to undercut Judge Rosenn's attempt to give a broad reading to the type of "commitment" comprehended by the second sentence in the 1789 Act.
 
 
 [13]
 Ex parte Bollman and Swartwout involved a petition for habeas by the alleged seditious co-conspirators of Aaron Burr, who had been denied bail prior to trial
 
 
 [14]
 These include ad respondendum, used when a party wishes to initiate suit against a person already confined by the process of an inferior court; ad satisfaciendum, which enabled one court to award execution on the judgment of another court at common law; ad prosequendum, testificandum, and deliberandum, which issue to remove a prisoner in order to prosecute or to testify in any court, or to be tried in the proper jurisdiction; and the common law writ of ad faciendum et recipiendum, "to do and receive whatever the king's court shall consider in that behalf." Ex parte Bollman, 8 U.S. (4 Cranch) 75, 96-97, 2 L.Ed. 554 (1807)
 As explained in Carbo v. United States, "Although our own practice has limited the jurisdiction of courts and justices to issue the Great Writ, we have never abandoned the English system as to the ad prosequendum writ." 364 U.S. 611, 620, 81 S.Ct. 338, 343, 5 L.Ed.2d 329 (1960). Because state courts are not inferior courts except in the situations where appeals lie to the United States Supreme Court many uses to which these process writs were put at common law are inconceivable within the federal system. See Ex parte Bollman, 8 U.S. (4 Cranch) 75, 96-97, 2 L.Ed. 554 (1807). Consequently, Judge Gibbons' suggestion that the statutory grant "was as broad as the common law," see dissent infra at 170, should be read with caution.
 
 
 [15]
 The petition for a writ of habeas corpus filed by Mrs. Lehman alleged that the children are unlawfully detained and restrained of their liberty by the Lycoming Children's Agency in violation of the Fourteenth Amendment. It sought release of the children from the custody of the state agency and return to the mother's custody. Such a writ clearly sounds in habeas corpus ad subjiciendum, and cannot be construed as a mesne process or a 28 U.S.C. § 1651 writ that is utilized solely to facilitate the already-existing jurisdiction of a federal court. See also Fay v. Noia, 372 U.S. 391, 414, 83 S.Ct. 822, 835, 9 L.Ed.2d 837 (1963); Developments Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1043 (1970)
 
 
 [16]
 See Carbo v. United States, 364 U.S. 611, 620, 81 S.Ct. 338, 343, 58 L.Ed.2d 329 (1960); Ex parte Bollman, 8 U.S. (4 Cranch) 75, 93, 100, 2 L.Ed. 554 (1807)
 
 
 [17]
 This is not to dispute that other habeas writs exist, such as the ad prosequendum writ utilized in Carbo, supra and the writ fashioned to obtain petitioner's appearance on appeal in Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), applications which are not subject to statutory or jurisdictional limitations. But such writs within the court's inherent power that are used to facilitate the exercise of jurisdiction are available only after the court has otherwise obtained jurisdiction
 
 
 [18]
 Ex parte Bollman, 8 U.S. (4 Cranch) 75, 95, 98, 2 L.Ed. 554 (1807) (power to grant writs of habeas to inquire into cause of commitment vested in courts as well as justices and judges)
 
 
 [19]
 The first modification, in response to South Carolina's nullification ordinance, enabled federal courts to release from state custody persons who had been acting under federal authority. See Force Act of March 2, 1833, c. 57, § 7, 4 Stat. 634-35. Subsequently, the Act of August 29, 1842, c. 257, 5 Stat. 539-40, extended federal habeas to foreign nationals acting under authority of a foreign state. It is noteworthy that, like the earlier Force Act and the later modification in the 1867 Act, the 1842 amendment was prompted by a political crisis the British diplomatic protest to the trial of a Canadian soldier by a New York state court. See People v. McLeod, 25 Wend. 483, 1 Hill. 377 (N.Y.Sup.Ct.1841). While all significant statutory changes in the federal writ were responses to grave political crises, no equivalent crisis can be said to exist here
 
 
 [20]
 See Cong.Globe, 39th Cong., 1st Sess. 87 (1865) (House resolution precipitating Bill No. 605, which became, with slight changes, the Judiciary Act of 1867)
 
 
 [21]
 See Cong.Globe, 39th Cong., 1st Sess. 4151 (1866) (House Bill No. 605)
 
 
 [22]
 28 U.S.C. § 2254(b)
 
 
 [23]
 See Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)
 
 
 [24]
 See Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968)
 
 
 [25]
 See Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973)
 
 
 [26]
 See Strait v. Laird, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972)
 
 
 [27]
 Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), in which the Supreme Court declined to extend the Eighth Amendment into the context of school disciplinary proceedings, presented a somewhat similar question on the extent of federal court intervention into child care and education. The Court recognized a difference between children and criminals for Eighth Amendment purposes just as we have suggested here with respect to habeas corpus and found existing state and common law remedies adequate to protect the child
 
 
 [28]
 In contrast, we would expect that the present situation, which deals with family concerns to which the entire community is sensitive, would be appropriately dealt with by the state legislatures. See J. Ely, Democracy and Distrust, 73-104 (1980)
 
 
 [29]
 In his thoughtful essay on Structure and Relationship in Constitutional Law, Professor Charles Black of the Yale Law School admonishes that federal courts should consider not only the particular textual provision in question (whether statutory or constitutional) but should also ground their reasoning on the structure of the federal union here, on the relationship of federal to state governments. Id. at 3-32 (1969). It certainly is true that the states were assumed to have exclusive jurisdiction in areas such as child welfare. Until Congress acts, then, indicating an intent to intervene via habeas, the federal courts should be hesitant to invade such areas
 Moreover, extending habeas removes the res judicata effect of the prior state judgment, a most significant jurisprudential departure, see plurality op. ante at 139, 143-144, constituting an important alteration in state-federal relations.
 
 
 [30]
 The district court, in a preliminary order, denied the respondent's contention that Lehman had no standing, and the parties did not raise the issue on appeal. But while Mrs. Lehman has a sufficient personal interest in getting the present habeas relief she seeks, the question whether she is a sufficiently appropriate representative of the other interested parties the children is a difficult one, given the context of overlapping yet potentially conflicting parent and child interests. Not only does the problem deserve to be addressed, but a court of appeals may affirm a district court's decision on a different ground from that assigned by the trial court. See Harold Friedman Inc. v. Thorofare Markets, 587 F.2d 127, 140 (3d Cir. 1978)
 
 
 [31]
 Inasmuch as the complaint has asserted no basis for the court's jurisdiction other than 28 U.S.C. §§ 2241 and 2254, our standing discussion is necessarily framed by this statutory context. We acknowledge that Mrs. Lehman might well have standing to bring a § 1983 action challenging the constitutionality of the statute on its face and as applied to her, but that is not the question before us. Rather than imposing our views of the merits on Mrs. Lehman, as Judge Gibbons asserts we do, it is Mrs. Lehman who has brought her cause of action in its particular form and accordingly defined the perspective for our standing analysis. In fact, counsel for Mrs. Lehman made it clear at oral argument that the decision to proceed by way of habeas rather than under § 1983 was quite advertent
 
 
 [32]
 See Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1202, 1212, 31 L.Ed.2d 551 (1972)
 
 
 [33]
 The family unit has found protection in the Due Process and the Equal Protection Clauses of the Fourteenth Amendment, see Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), as well as under the Ninth Amendment. See Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)
 
 
 [34]
 See Moore v. City of East Cleveland, 431 U.S. 494, 503-04, 97 S.Ct. 1932, 1937-38, 52 L.Ed.2d 531 (1977); Wisconsin v. Yoder, 406 U.S. 205, 232-34, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15 (1972); Note, The Mental Hospitalization of Children and the Limits of Parental Authority, 88 Yale L.J. 186 (1978) (articulating five justifications for parental authority: social pluralism, social order, parental privilege, family autonomy, and the child's welfare); Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985, 990-93 (1975)
 
 
 [35]
 Should the children be in state custody against their will, it is even possible that habeas would be an appropriate vehicle for the legal attack
 
 
 [36]
 See Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978)
 
 
 [37]
 See In re Smith, 16 Md.App. 209, 266, 295 A.2d 238, 246 (1972) (parent may not compel 16-year-old to have abortion). Martin v. Martin, 308 N.Y. 136, 138-39, 123 N.E.2d 812 (1954) (per curiam) (12-year-old permitted to attend church of choice and transfer from parochial school over parent's objection). In Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court explicitly noted that the record showed no evidence of a conflict between parent's and children's wishes concerning schooling, but conceded that existence of such a conflict would present a very different question. 406 U.S. at 230-31, 92 S.Ct. at 1540-41
 
 
 [38]
 See Parham v. J. R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (parent retains substantial, if not dominant, role in decision to have child institutionalized in mental hospital notwithstanding child's interest in not being confined unnecessarily for treatment or stigmatized as mentally ill)
 
 
 [39]
 Unchecked exercise of such a power might ultimately undermine its very basis. Parental authority legitimately proceeds from ties that bind, and might forfeit moral validity and legal protection when it becomes solely the imposition of one will upon another. See Parham v. J. R., 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979) ("historically, it has been recognized that natural bonds of affection lead parents to act in the best interests of their children.")
 
 
 [40]
 See Note, Lawyering for the Child: Principles of Representation in Custody and Visitation Disputes Arising from Divorce, 87 Yale L.J. 1126, 1135 n.36 (1978). "(A)s of 1975, 31 jurisdictions appeared to have had statutes establishing the 'best interests of the child' as the standard for divorce custody adjudications."
 
 
 [41]
 See Note, supra n.40, at 1127 (24 jurisdictions have implemented legal representation for the child)
 
 
 [42]
 The very existence of statutes authorizing state intervention on behalf of neglected and abused children reflects the principle that parental rights are limited by, and occasionally different from, the legitimate interests of their children. See J. R. v. Parham, 442 U.S. at 630, 99 S.Ct. at 2518. (Brennan, J., dissenting); Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985 (1975)
 
 
 [43]
 See Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (best interests of child, state's interest in providing for well-being of illegitimate children through adoption and unwed parent's interest in child all arguably different); Smith v. Organization of Foster Families, 431 U.S. 816, 841 n.44, 97 S.Ct. 2094, 2108 n.44, 53 L.Ed.2d 14 (1977) (state, natural parents and foster parents, all of whom shared some portion of responsibility for guardianship of child, were parties to suit, and all contended that position they advocated was most in accord with rights and interests of children)
 
 
 [44]
 See Wisconsin v. Yoder, 406 U.S. 205, 230, 233-34, 92 S.Ct. 1526, 1540, 1542, 32 L.Ed.2d 15 (1972); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Goldstein, Medical Care For the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L.J. 645 (1977)
 
 
 [45]
 See Smith v. Organization of Foster Families, 431 U.S. 816, 846, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977)
 
 
 [46]
 See Stanley v. Illinois, 405 U.S. 645, 649, 652, 92 S.Ct. 1202, 1211, 1213, 31 L.Ed.2d 551 (1972)
 
 
 [47]
 In fact, because the children have articulated a wish not to return, this case approaches the standing dilemma that the Supreme Court declined to answer in Gilmore v. Utah, 429 U.S. 1012 at 1013-14, 97 S.Ct. 436 at 437-38, 50 L.Ed.2d 632 (1976). There, Bessie Gilmore, claiming to act as "next friend" on behalf of her son, filed an application for a stay of execution of the death sentence. The Court concluded, after a careful examination of the record, that her son Gary Gilmore did not want a stay and had knowingly and intelligently waived any rights he might have asserted after imposition of sentence. One concurrence concluded that the "next friend" concept was wholly inapplicable in that case on account of the express divergence between the biological parent's and child's wishes. Admittedly, the Gilmore case differs somewhat from the situation here. Gary Gilmore was of age and his attorneys had filed a response challenging the standing of Gilmore's mother. However, the situation presented in Gilmore may suggest that a dichotomy of interests between the party asserting a right and the person on whose behalf the right is asserted is relevant to the standing inquiry. See Brilmayer, The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement, 93 Harv.L.Rev. 297, 310-314 (1979)
 
 
 [48]
 One child has been with the same foster family for 10 years now, since he was one year old and he is presently unable to relate emotionally to Mrs. Lehman. See In re William L., 477 Pa. 322, 383 A.2d 1228, 1239 (1978). Cf. Smith v. Organization of Foster Families, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977) (child continuously in care of same foster parents develops strong ties to those parents, equivalent to bonds within natural family)
 
 
 [49]
 See J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1973); Cf. Smith v. Organization of Foster Families, 431 U.S. 816, 826, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977) (possibility for deep emotional ties even in absence of blood relationship)
 
 
 [50]
 In addition, to justify extending the writ to the parent with the belief that the children could always object, would force the court to demand express opposition from the child before the judiciary will recognize a conflict between the interest of the parent and interest of the child. This is unrealistic from the perspective of common sense as well as the psychologist's understanding of the child's emotional dilemma. Children's loyalties to, and dependencies on, their parents, regardless of overt disagreement and even in the absence of the physical and emotional minima needed by the child, often create an ambivalence which reduces a child to silence. To permit children to bring a habeas petition in state court in the present situation, should they be so motivated, would be legally and psychologically realistic; to allow a parent to petition, absent the child's objections, in a context where emotional conflict often results in silence, would tend toward a misreading of the child's best interest. Burt, Developing Constitutional Rights of, in and for Children, 39 Law & Contemp.Prob. 118, 126-30 (1975)
 
 
 [51]
 If federal habeas is permitted in this situation, and res judicata eliminated as a bar, there is nothing to preclude a parent from filing a petition for a writ of habeas corpus years after the original separation, and then litigating the constitutional issue completely afresh
 
 
 *
 The writer of this dissent sat as a member of the panel that initially heard this case. He also sat as a member of the court in banc that subsequently was convened, heard oral argument, and participated in the in banc discussion of the case following oral argument. Thereafter, on January 21, 1981, he took senior status under 28 U.S.C. §§ 371(b) and 294(b)
 
 
 [1]
 The division of the court in this case is such that none of the filed opinions represents a majority viewpoint. Two opinions, however, Judge Garth's and Judge Adams', command a plurality. To avoid confusion, I will refer to Judge Garth's opinion as that of "the plurality," because it announces the judgment of the court, and to Judge Adams' opinion as that of "the concurring plurality."
 
 
 [2]
 In his concurring plurality opinion, Judge Adams posits Ms. Lehman's alleged lack of standing as one ground for denying jurisdiction in the case at bar. I think it important to emphasize that Judge Adams is not, as I read the opinion, addressing the issue of "standing" in the constitutional sense, which might raise a jurisdictional problem worthy of sua sponte consideration. See concurring op., supra at 151 n.30. Rather, he is concerned that Ms. Lehman may not be the best or even a proper relator in this action. Because I do not consider that issue to affect the question of jurisdiction, I do not address it. I believe that the question of proper representation is a matter to be determined by the district court in pre-trial proceedings, after it has assumed jurisdiction, in the same fashion that representation disputes are determined under the class-action rules. As Judge Garth notes, Garth pl. op., supra at 138 n.3, the standing issue is not properly before us and unless it affects our jurisdictional authority to hear the case, we should not reach conclusions of law on the basis of an undeveloped factual record
 
 
 [3]
 Although the plurality characterizes the placement of the children with the Agency as a voluntary surrender of custody, Garth pl. op., supra at 136, the placement was done informally and the parties intended that the custody be only temporary. This certainly is the intent revealed in Ms. Lehman's petition and is supported by the county court's order awarding the Agency temporary custody
 
 
 [4]
 The First Circuit relied upon several factors in reaching this conclusion. First, the court found "a long history of state predominance and federal deferral in family law matters." 584 F.2d at 1112. Second, the court found it unclear whether "the welfare of children and families would be promoted by creating a right to litigate in two sets of courts instead of one, thus extending the potential duration of litigation in this area." Id. Finally, the court stated its belief that, "if litigation expenses mount, social workers and charitable organizations such as the Home may well become less willing to seek placements for children over their parents' objections, whether rational or irrational, even though in their honest judgment the child's best interests demand it." Id
 
 
 [5]
 There is precedent in the common law for the use of the writ of habeas corpus to challenge child custody. "(M)ore than a century ago an English court permitted a parent to use habeas corpus to obtain his children from the other parent, even though the children 'were not under imprisonment, restraint, or duress of any kind.' " Jones v. Cunningham, 371 U.S. 236, 239, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963). Although that case is not dispositive of the issue presented by the case before us, whether federal habeas jurisdiction should be exercised, it does provide support for the conclusion that the statutory prerequisite of "custody" has been satisfied
 
 
 [6]
 The plurality asserts that this statement is incorrect and that the First Circuit rejected the district court's finding that the Sylvander child was in custody for purposes of the statute. Garth pl. op., supra at 142 n.9a. The plurality relies on a lengthy quote from Sylvander which culminates in a holding that "(t)his is not the kind of custody that has traditionally prompted federal courts to assert their jurisdiction in the face of prior state adjudication." See id. I first note that this statement itself recognizes the existence of federal jurisdiction and is addressed only to the propriety of asserting it. Second, I submit that a "fair reading" of the quoted passage in the text accompanying the plurality's note 9a reveals a discussion of policy, not statutory interpretation
 
 
 [7]
 I believe that the exercise of section 1983 jurisdiction is significantly more intrusive upon state interests than is federal habeas corpus. The intrusive nature of such an action is demonstrated by the arguments advanced by the plurality. They suggest, as a method for obtaining federal review, that a parent in Ms. Lehman's position reserve her federal claims in the state proceedings so that they may be preserved and asserted in a later section 1983 action in federal court. Garth pl. op., supra at 144-146. The problems with such a procedure, however, are readily apparent
 First, such a procedure effectively precludes state courts from addressing federal challenges to state statutes and procedures. This is an important state interest, Preiser v. Rodriguez, 411 U.S. 475, 490, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973), and one which is served by the exhaustion requirement of federal habeas corpus.
 Second, to the extent that parents follow the litigation strategy suggested by the plurality they ensure protracted litigation because state courts would have no opportunity to resolve successfully the federal constitutional claims. Duplicate litigation and expense would therefore be required. Thus, the children's interest in a speedy and final determination of their status, an interest which the plurality recognizes is significant, Garth pl. op., supra at 143-144, will be disserved. The exhaustion requirements of federal habeas corpus, however, require that the parents' federal constitutional claims be addressed, in the first instance, by the state courts. Thus, there is an opportunity, not available under the procedure urged by the plurality, for an early and satisfactory resolution of the federal claims.
 
 
 [8]
 See, e. g., Sylvander v. New England Home for Little Wanderers, 584 F.2d at 1109 n.9
 
 
 [9]
 The right to family privacy and parental autonomy, as well as the reciprocal liberty interest of parent and child in the familial bond between them, need no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity. But the right of parents to raise their children as they think best, free of coercive intervention, comports as well with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents. No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breaches in the familial bond will be detrimental to a child's well-being. But "so long as a family is intact, the young child feels parental authority is lodged in a unified body which is a safe and reliable guide for later identification." Court or agency intervention without regard to or over the objection of parents can only serve to undermine the familial bond which is vital to a child's sense of becoming and being an adult in his own right
 Goldstein, Medical Care for the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L.J. 645, 649-50 (1977) (footnotes omitted).
 
 
 [10]
 Thus, I cannot agree with the plurality's declaration that the mother alone has an interest here. See Garth pl. op., supra at 142. The children as well have a biological and emotional identification with the natural parent which constitutes a protected and fundamental interest. Furthermore, although the children in this case may have expressed a desire not to be returned to their natural parent, I do not believe that raises a jurisdictional issue. Rather, it would be a matter for the district court's consideration in weighing the merits once jurisdiction is established
 
 
 [11]
 The Supreme Court's basis for its constitutional concern with the integrity of the family is set forth in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972):
 The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and "(r)ights far more precious than property rights," May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953) The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, at 541, 62 S.Ct. at 1113 and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).
 
 
 [12]
 In commenting on the liberty interest inherent in the parent-child relationship, the Court in Meyer v. Nebraska, supra, observed:
 The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary without reasonable relation to some purpose within the competency of the State to effect. Determination by the legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts.
 262 U.S. at 399-400, 43 S.Ct. at 626-27.
 
 
 [13]
 The Seventh Circuit recently observed: "Certainly where a biological relationship exists, the power of the state to regulate activity is limited." Kyees v. County Dep't. of Pub. Welfare, 600 F.2d 693, 697 (7th Cir. 1979)
 
 
 [14]
 The court reserved judgment on the vagueness challenge. 545 F.2d at 1137-38
 
 
 [15]
 In Roe v. Conn, 417 F.Supp. 769, 777 (M.D.Ala.1976) (three-judge court), the court followed Alsager and held that "the Constitution recognizes as fundamental the right of family integrity." On that basis, the court declared unconstitutional a statute authorizing the State to seize a child and remove it from its parents if "the child is in such condition that its welfare requires such removal."
 
 
 [16]
 In this term alone, the Supreme Court has taken action on three cases presenting constitutional challenges to parental rights termination proceedings. Lassiter v. Department of Social Serv., -- U.S. --, 101 S.Ct. 70, 66 L.Ed.2d 21 (1980), granting cert. to In re Wm. C. Lassiter, 43 N.C.App. 525, 259 S.E.2d 336 (1979); Santosky v. Kramer, -- U.S. --, 101 S.Ct. 1694, 68 L.Ed.2d 192 (1981), granting cert. to In re John A. A., 75 A.D.2d 910, 427 N.Y.S.2d 319 (1980). The petition for a writ of certiorari was granted in Santosky shortly after the Court found it necessary to dismiss the appeal in Doe v. Delaware, -- U.S. --, 101 S.Ct. 1495, 67 L.Ed.2d 312 (1981) for want of a properly presented federal question. Cf. 101 S.Ct. at 1496 n.4 (Brennan, J., dissenting) (dismissal for want of a properly presented federal question does not reflect on that question's substantiality)
 
 
 [17]
 The significant interests protected by the exhaustion requirement are of two types. First, exhaustion preserves the role of the state courts in the application and enforcement of federal law.... Second, exhaustion preserves orderly administration of state judicial business It is important that petitioners reach state appellate courts, which can develop and correct errors of state and federal law and most effectively supervise and impose uniformity on trial courts
 Developments in the Law: Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1094 (1970) (footnote omitted).
 
 
 [18]
 Such a holding would be consistent with the established federal policy which affords to the states substantial independence in the regulation of family relationships
 Government policy toward the family has traditionally been regarded as presenting local rather than national questions. Generally speaking, "there is no federal law of domestic relations, which is primarily a matter of state concern." But the states' power to legislate and administer family law has never been exempt from constitutional limitations. Restricting state power within constitutional bounds is an appropriate task for the federal judiciary, and carrying out this duty "does not make of (the Supreme) Court a court of probate and divorce." The Court has properly insisted that state intervention respect fundamental human rights.
 Developments in the Law: The Constitution and the Family, 93 Harv.L.Rev. 1156, 1159 (1980) (footnotes omitted).
 
 
 [1]
 The probable intention of the draftsmen in adding the proviso to section 14 was, I believe, to limit only the power of a single judge or justice conferred in the second sentence. As Judge Adams points out, in Ex parte Dorr, 44 U.S. (3 How.) 103, 11 L.Ed. 514 (1845), the Court construed the proviso to be applicable to the entire section. Justice McLean said:
 This is so clear, from the language of the section, that any illustration of it would seem to be unnecessary. The words of the proviso are unambiguous. 44 U.S. (3 How.) at 105, 11 L.Ed. 514. With deference, one may disagree. The writ was sought by Francis C. Treadwell on behalf of his client so as to gain access to the client for the purpose of having him sign a writ of error. The Supreme Court had unquestioned jurisdiction to entertain that writ since Dorr was challenging the validity of his conviction on at least two significant constitutional grounds. See Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821). One was whether, despite Article III section 3 of the Constitution, a defendant could be convicted of treason against a state. The other was whether, assuming an affirmative answer to the first question, a defendant could be convicted of treason against a government not republican in form. The court was not then anxious to decide either federal question. It avoided deciding the latter question in Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed.2d 581 (1849) also. The effect of Ex parte Dorr was that, by locking Dorr up so that he could not sue out a writ of error, the Charter Government of Rhode Island was permitted to accomplish the result for which Virginia had argued unsuccessfully in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821), that of allowing separate states final construction of the federal laws. Ex parte Dorr is a less than reputable product of an unfortunate time in which the Court was attempting to stand aside from the emerging states' rights dispute. Its holding that section 14 of the Judiciary Act does not extend to bring up a state prisoner for any other purpose than to be used as a witness, i. e. to set his appeal to the federal courts in motion, fortunately, does not survive Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). But even the now repudiated misconstruction of the proviso has nothing to do with this case, since we are not dealing with a commitment to jail. Justice McLean's reference in Ex parte Dorr to civil commitment is to commitment to jail as mesne process, not to custody outside jail.
 
 
 [2]
 The expansions to which the plurality refers, which are codified in 28 U.S.C. § 2254(c), have nothing to do with the question presented here. The children whose custody is sought have never been in jail and never would have fallen within the coverage of the proviso of section 14. Someone seeking to obtain their custody would never have had to rely on the now codified exceptions to the proviso which, beginning with the Force Act of 1833, § 7, 4 Stat. 634-35, Congress gradually adopted. The Judiciary Act of 1867, 14 Stat. 385, to which the concurring opinion devotes so much space, in no way affected the authority conferred in the 1789 statute. Ex parte Yerger, 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1868)
 
 
 [3]
 It thus overruled the Ex parte Dorr construction of the habeas corpus statute. See note 1 supra
 
 
 [4]
 In Fay v. Noia, the Supreme Court instructed:
 (I)t would appear that the Constitution invites, if it does not compel , a generous construction of the power of the federal courts to dispense the Writ conformably with common-law practice.
 372 U.S. 391, 406, 83 S.Ct. 822, 831, 9 L.Ed.2d 837 (1963) (citation omitted).
 
 
 [4]
 Rex v. Clarkson, 1 Str. 444, 93 Eng.Rep. 625 (K.B. 1722)
 
 
 [5]
 Id., at 445, 93 Eng.Rep., at 625
 
 
 [6]
 Rex v. Delaval, 3 Burr. 1434, 97 Eng.Rep. 913 (K.B. 1763)
 
 
 [7]
 Id., at 1437, 97 Eng.Rep., at 914
 
 
 [8]
 Earl of Westmeath v. Countess of Westmeath, as set out in a reporter's footnote in Lyons v. Blenkin, 1 Jac. 245, 264, 37 Eng.Rep. 842, 848 (Ch. 1821); accord Ex parte M'Clellan, 1 Dowl. 81 (K.B. 1831)
 
 
 [5]
 It should also be noted that Sommersett's Case, 20 How.St.Tr. 1, sub nom. Somerset v. Stewart, 98 Eng.Rep. 499 (1772), in which Lord Mansfield held that slavery did not exist under the common law of England, was a writ of habeas corpus. Certainly disputes over the custody of servants did not fall within the proviso to section 14, and, were they to arise today, would not be governed by section 2241(c)
 
 
 [12]
 E. g., Boardman v. Boardman, 135 Conn. 124, 138, 62 A.2d 521, 528 (1948); Barlow v. Barlow, 141 Ga. 535, 536-537, 81 S.E. 433, 434 (1914); In re Swall, 36 Nev. 171, 174, 134 P. 96, 97 (1913) ("the question of physical restraint need be given little or no consideration where a lawful right is asserted to retain possession of the child"). See also In re Hollopeter, 52 Wash. 41, 100 P. 159 (1909) (husband held entitled to release of his wife from restraint by her parents); In re Chace, 26 R.I. 351, 358, 58 A. 978, 981 (1904) (wife held entitled to husband's society free of restraint by his guardian)
 
 
 [6]
 This case does not require that we determine whether the exhaustion rule of Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944), codified in 28 U.S.C. § 2254(b), applies to writs of habeas corpus other than for state prisoners, since any test which might apply under that section has been met. I note, however, that it is doubtful that Congress, when it enacted the recodification of the Judicial Code in 1948, had in mind anything more than codification of the Hawk result. Thus exhaustion of state remedies probably has no significance except as it bears upon res judicata. See part IV infra
 
 
 [7]
 Judge Adams' repeated reference to Ms. Lehman's jurisdictionally deficient complaint ignores 28 U.S.C. § 1653, which provides that "(d)efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." See concurring opinion, at 148 n.7, 149 nn.15, 17 & 151, n.31
 
 
 [8]
 It is worthwhile to add that the unconsidered dicta in Barber v. Barber, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1859) and In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890), about federal courts' incompetence to decide cases involving domestic relations issues has long since been buried under an avalanche of Supreme Court precedent deciding such cases where there is subject matter jurisdiction. See, e. g., Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (parents' authority over minor's abortion decision); Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (limits on parental authority to institutionalize children); Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (child custody; decided on Younger grounds; jurisdiction assumed); Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (rights of natural mother in adoption); Quillion v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (rights of natural father in adoption); Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (right to marry when supporting minor children); Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (state regulation of housing for extended families); Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (procedural safeguards for foster family relationship); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (husband's or parent's authority respecting abortions); Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (state limitations on access to divorce); Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (maternity leave policy); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (state restrictions on abortion); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (state interference with parental control over education of child); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (child custody rights of unwed father); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (state limitations on access to divorce); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (validity of state law prohibiting marriage); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (state control of contraception in marriage relationship); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (state control over parent-ordered child labor); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (state interference with education of children). See Developments in the Law The Constitution and the Family, 93 Harv.L.Rev. 1156 (1980)
 
 
 [9]
 The plurality's acknowledgment that Ms. Lehman could get into federal court illustrates the folly of the artificial dichotomy it has attempted to draw between habeas corpus outside the state prisoner context and other exercises of federal judicial power. If we hypothesize that Ms. Lehman, perhaps mindful of the possible trauma caused by a sudden change in custody, were to bring a federal court action seeking in the first instance a declaratory judgment that a child's present custody is unlawful and should be changed, and were to succeed in that action, it would be an incredible suggestion that the court which rendered such a declaratory judgment could not make it effective by resort to the mesne process of habeas corpus authorized by Secs. 1651(a) and 2241(a)
 
 
 [10]
 The law of standing to assert federal law claims binds not only the federal courts, but state courts as well. Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943)
 
 
 [11]
 Although Judge Adams argues that habeas corpus is not available in this case, in assuming its availability for purposes of his discussion of standing he incorrectly assumes that it is a source of jurisdiction
 
 
 [12]
 The recent amendment to § 1738, § 1738A, concerning full faith and credit given to child custody determinations is inapplicable since it deals only with states. Parental Kidnapping Prevention Act of 1980, Pub.L.No. 96-611, § 8, 49 U.S.L.W. 228 (Statutes March 10, 1981)
 
 
 [13]
 Section 321 of the Adoption Act provides:
 A decree terminating all rights of a parent or a decree terminating all rights and duties of a parent entered by a court of competent jurisdiction shall extinguish the power or the right of such parent to object to or receive notice of adoption proceedings. The decree shall award custody of the child to the agency or the person consenting to accept custody under section 301 or section 302, or the petitioner in the case of a proceeding under section 312. An agency or person receiving custody of a child shall stand in loco parentis to the child and in such capacity shall have the authority, inter alia, to consent to marriage, to enlistment in the armed forces and to major medical, psychiatric and surgical treatment, and to exercise such other authority concerning the child as a natural parent could exercise.
 
 
 [1]
 Pa.Cons.Stat.Ann. § 321 (Purdon Supp.1979) (footnotes omitted) (repealed and recodified 23 Pa.Cons.Stat.Ann. Sec. 2521 (Purdon Supp.1981-82))
 
 
 [14]
 In Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), discussed infra, for example, had the challenge to the New Hampshire statute been made in a state court, that court would have been obliged to give the same relief as was given in the federal district court. Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947)
 
 
 [15]
 The classic example of a judgment having ongoing effects which violate the constitution is, of course, a judgment of sentence under an unconstitutional statute, or obtained in violation of due process. Such an example could not arise in the court of a sister state, but obviously could and did arise when federal courts were asked for relief from the ongoing effects of such a judgment. In Fay v. Noia, 372 U.S. 391, 465-66, 83 S.Ct. 822, 862-63, 9 L.Ed.2d 837 (1963), even dissenting Justice Harlan conceded that if the state judgment were procedurally deficient by federal due process standards it was reviewable under habeas corpus, a position with which Justice Powell in Stone v. Powell, 428 U.S. 465, 494 & n.37, 96 S.Ct. 3037, 3052 & n.37, 49 L.Ed.2d 1067 (1976), did not disagree. That position is consistent with the more general proposition discussed above, that section 1738 does not require ongoing enforcement of judgments obtained in violation of due process. The majority in Fay v. Noia went further, insisting that substantive violations of the constitution must also be recognized
 It is perhaps unfortunate that so much emphasis was placed upon the mystique of habeas corpus in Fay v. Noia and so little on a construction of section 1738 which is, or at least should be, compelled by the due process clause of the fifth amendment. Had that broader principle been announced it might have been more difficult for Justice Powell to start down the unfortunate path taken in Stone v. Powell, supra, of selective enforcement of the Bill of Rights.
 
 
 [16]
 Pennsylvania law on the preclusive effect of such decrees must be read to include the availability of relief from unconstitutional judgments